

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

**F I L E D**

SEP 0 3 2019

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

THE OSAGE NATION,                                    )
                                    )
       Plaintiff,                                   )
                                      )
vs.                                    )

Case No. 19-cv-00485-GKF-JFJ

(Removal from: District Court of Osage County, Case No. CJ-2019-135)

(1)  PURDUE PHARMA L.P.,                              )
(2)  PURDUE PHARMA INC.,                              )
(3)  THE PURDUE FREDERICK COMPANY,                    )
(4)  CEPHALON, INC.,                                  )
(5)  TEVA PHARMACEUTICAL INDUSTRIES, LTD.,            )
(6)  TEVA PHARMACEUTICALS USA, INC.,                  )
(7)  JANSSEN PHARMACEUTICALS, INC.,                   )
(8)  JOHNSON & JOHNSON,                               )
(9)  ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS,            )
     INC.,                                           )
(10) JANSSEN PHARMACEUTICA, INC.,                     )
(11) ENDO HEALTH SOLUTIONS INC.,                      )
(12) ENDO PHARMACEUTICALS INC.,                       )
(13) PAR PHARMACEUTICAL, INC.,                        )
(14) ALLERGAN PLC,                                    )
(15) ACTAVIS PLC,                                     )
(16) WATSON PHARMACEUTICALS, INC.,                    )
(17) WATSON LABORATORIES, INC.,                       )
(18) ACTAVIS PHARMA, INC.,                            )
(19) WATSON PHARMA, INC.,                             )
(20) ACTAVIS LLC,                                     )
(21) MALLINCKRODT PLC,                                )
(22) MALLINCKRODT LLC,                                )
(23) SPECGX, LLC,                                     )
(24) MYLAN PHARMACEUTICALS INC.,                      )
(25) SANDOZ, INC.,                                    )
(26) MCKESSON CORP.,                                  )
(27) CARDINAL HEALTH, INC.,                           )
(28) AMERISOURCEBERGEN DRUG CORP.,                    )
(29) WALGREENS BOOTS ALLIANCE, INC. a/k/a             )
     WALGREEN CO.,                                   )
(30) MORRIS & DICKSON CO, LLC,                        )
(31) WAL-MART INC. f/k/a WAL-MART STORES INC.,        )
(32) MCQUEARY BROTHERS DRUG COMPANY, LLC,             )
     and                                             )
(33) SAJ DISTRIBUTORS,                                )

       Defendants.

SF: 313401-3

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1442 and 1446, Defendant McKesson Corporation ("McKesson") hereby gives timely notice of the removal of this matter from the District Court of Osage County, Oklahoma to this Court.  As grounds for removal, McKesson states as follows:

## I.    NATURE OF THE REMOVED ACTION

1.      On July 26, 2019, Plaintiff the Osage Nation (the "Tribe") filed a Petition in the District Court of Osage County, State of Oklahoma, against McKesson as well as Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company; Cephalon, Inc.; Teva Pharmaceutical Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceutical, Inc.; Allergan PLC; Actavis PLC; Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc.; Watson Pharma, Inc.; Actavis LLC; Mallinckrodt PLC; Mallinckrodt LLC; SPECGX, LLC; Mylan Pharmaceuticals Inc.; Sandoz, Inc.; Cardinal Health, Inc.; AmerisourceBergen Corp.; Walgreens Boots Alliance, Inc. a/k/a Walgreen Co.; Morris & Dickson Co, LLC; Wal-Mart Inc. f/k/a Wal-Mart Stores Inc.; McQueary Brothers Drug Company, LLC; and SAJ Distributors.  The case was assigned Case No. CJ-2019-135.

2.      The Tribe alleges that McKesson, as a distributor of prescription medications, is liable under Oklahoma law for harms purportedly caused by the distribution of prescription opioids in and around the Tribe's community (the "Tribal Area"). Pet. ¶ 157 ("Each Distributor Defendant repeatedly and purposefully breached its duties under common law and state law. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Plaintiffs' Community."); id. ¶ 158 ("The unlawful diversion of prescription opioids

is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality within the Osage Nation.").

3.      Critically, the allegations in the Petition put at issue *all* distributions of prescription opioids in the geographic vicinity of the Tribal Area. *See*, *e.g.*, Pet. ¶ 172 (alleging that the Distributor Defendants "flood[ed] the market in and around the Osage Nation's Community with highly addictive opioids"); *id.* ¶ 175 ("The Distributor Defendants were aware of widespread prescription opioid abuse in and around the Osage Nation's Community, but . . . nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in those areas in such quantities that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.").

4.      Similarly, the Tribe does not attempt to carve out distributions made to any particular pharmacies or facilities, and instead alleges that distributors "failed to adequately control the[] supply lines" of prescription opioids shipped to *all* facilities in and around the Tribal Area. *Id.* ¶ 170 (alleging that distributors failed to ensure that controlled substances distributed to "pharmacies servicing the areas around the Osage Nation's Community" were "not being diverted to illegal uses"); *id.* ¶ 171 (alleging that distributors "created incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse" by compensating employees "by the volume of their sales of opioids to pharmacies and other facilities servicing the areas around the Osage Nation's Community").

5.      Furthermore, the Petition alleges that the defendants, including McKesson, caused prescription opioids to be disproportionately prescribed to veterans in and around the Tribal Area. Pet. ¶ 99 ("Through these [Key Opinion Leaders], front groups and others, Defendants preyed on the most vulnerable, including children, veterans and the elderly"); *id.* ¶ 100 (alleging that defendants used a front group that "specifically targeted veterans" in promoting prescription

opioids). In particular, the Tribe contends that all of the Defendants acted "in concert with each other" to produce, promote, and market opioids to the citizens of the Osage Nation. Pet. ¶ 190. Thus, any portions of the Petition that make specific allegations about actions taken by the Manufacturer Defendants affect McKesson's potential liability.

6.        McKesson removes this action under 28 U.S.C. § 1442.  As set forth more fully below, the Tribe's allegations against McKesson relate to and necessarily implicate McKesson's distribution of pharmaceuticals to the Veterans' Administration ("VA") and the Indian Health Service ("IHS"). McKesson distributes pharmaceuticals, including opioids, to these customers at the direction of a federal officer under an exclusive federal contract. Specifically, McKesson entered into and is bound by an exclusive federal contract called the Pharmaceutical Prime Vendor Contract ("PPV Contract").

## I.      THIS CASE IS REMOVABLE UNDER FEDERAL OFFICER REMOVAL.

7.        The federal officer removal statute authorizes "any person acting under" a federal officer to remove to federal court a civil action "for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).

8.        Federal officer removal requires a defendant to show "(1) that it acted under the direction of a federal officer; (2) that there is a causal nexus between the plaintiff's claims and the acts the private corporation performed under the federal officer's direction; and (3) that there is a colorable federal defense to the plaintiff's claims." *Greene v. Citigroup, Inc.*, 215 F.3d 1336, at *2 (10th Cir. 2000).

9.        The federal officer removal statute has long been "liberally construed" in favor of removal and protecting the right of defendants acting under federal officers' authority to a federal forum. *Colorado v. Symes*, 286 U.S. 510, 517 (1932). The Supreme Court has held that "the right of removal is absolute for conduct performed under color of federal office, and has insisted that

4

the policy favoring removal should not be frustrated by a narrow, grudging interpretation of §

1442(a)(1)." *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (citation and quotation omitted).

There has therefore been "a clear command from both Congress and the Supreme Court that when

federal officers and their agents are seeking a federal forum, we are to interpret section 1442

broadly in favor of removal." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir.

2006).

### A.    The Multi-District Opioid Litigation

10.    This action is one of hundreds of related lawsuits asserting claims arising out of the

sale, marketing, and distribution of prescription opioids nationwide.

11.    On December 5, 2017, the Judicial Panel on Multidistrict Litigation (JPML) formed

a multidistrict litigation (MDL) and transferred opioid-related actions to Judge Dan Aaron Polster

in the Northern District of Ohio pursuant to 28 U.S.C. § 1407. *See* Transfer Order, *In re Nat'l

Prescription Opiate Litig.*, 1:17-md-2804 (J.P.M.L. Dec. 5, 2017), ECF No. 328. More than 2,000

opioid-related actions are currently pending in the MDL.

12.    McKesson intends to tag this case immediately for transfer to the MDL.

13.    McKesson has removed other opioid cases from state to federal court on the basis

that the complaints necessarily put at issue distributions under the PPV Contract—specifically,

cases relating to McKesson's PPV distributions to IHS. On September 4, 2018, in the first opinion

issued on the merits of McKesson's removal position, Judge Polster agreed that cases in which

plaintiffs' allegations implicated McKesson's PPV distributions belong in federal court under 28

U.S.C. § 1442(a)(1), and denied motions to remand in two cases brought by Native American

tribes alleging nearly identical claims to those at issue here. Opinion and Order, *In re Nat'l Opiate

Litig.*, M.D.L. 2804 (N.D. Ohio Sept. 4, 2018), ECF No. 934 (attached hereto as **Exhibit 1**). For

the same reasons, federal jurisdiction is appropriate here.

**B.     McKesson Acted Under Color of Federal Office.**

14.     The federal officer removal statute applies to private parties "'who lawfully assist' the federal officer 'in the performance of his official duty.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151 (2007) (citing *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)). It is well-established that government contractors who are involved in "an effort to assist, or help carry out, the duties or tasks of the federal superior" are "acting under" a federal officer. *Id.* at 152.

15.     Because the Tribe seeks recovery for harm caused by any and all diverted prescription opioids in and around the Tribal Area, without regard to the source (*see* Pet. at ¶¶ 172, 175), its claims necessarily implicate prescription opioids that McKesson supplied to tribal and federal facilities pursuant to its responsibilities as a government contractor.

16.     McKesson, through an exclusive contract with the United States government, is the primary distributor of prescription medications to IHS and the VA. It has supplied and continues to supply prescription medications, including opioids, to IHS and the VA in and around the Tribal Area. Pursuant to the PPV Contract, McKesson has the obligation to supply prescription medications to Tribal facilities when they are ordered by IHS through the PPV Contract, and has the same contractual obligation to supply VA facilities in and around the Tribal Area. In both the Tribal Area and the surrounding Green Country region,[1] distributions to federal customers under the PPV Contract represent a substantial percentage of McKesson's overall shipments of prescription opioids.

17.     The PPV Contract is governed by federal law and regulation, and is overseen by a federal contracting officer. Under the terms of the PPV Contract, McKesson must process and fill

---

[1] The Green Country region includes the following counties: Adair County, Craig County, Creek County, Cherokee County, Delaware County, Mayes County, McIntosh County, Muskogee County, Nowata County, Okmulgee County, Osage County, Ottawa County, Pawnee County, Rogers County, Sequoyah County, Tulsa County, Wagoner County, and Washington County.

all orders that it receives from authorized government purchasers, *see* PPV Contract § I-9(b). The PPV Contract provides for prompt, typically next-day, delivery of all orders. *Id*. I-9(l). Moreover, the PPV Contract does not grant McKesson discretion to deny any federal orders under the PPV Contract. *Id.* § AS3023 (Sept. 2010) (stating that McKesson "may not unreasonably delay filling an FSS [Federal Supply Schedule] order"). Instead, it must coordinate shipment decisions through the federal contracting officer assigned to administer the contract, who retains close day-to-day supervision over McKesson's fulfillment of federal orders.

18.     In compliance with the PPV Contract, McKesson has provided and continues to provide prescription medications including opioids to agencies, including IHS and VA facilities in and around the Tribal Area. Indeed, McKesson's contract covers the Tribe's clinics and hospitals.[2] McKesson thus is required by its federal contract to distribute the opioids at issue to the Tribe's clinics and hospitals, all of which are within the Tribal Area.

19.     Judge Polster recently ruled that this first element of the federal officer removal statute is satisfied by the PPV Contract, because "the assistance McKesson provides to the VA [under the PPV Contract] goes beyond simple compliance and helps the government perform basic tasks." Exhibit 1 at 16. Furthermore, Judge Polster concluded that "McKesson inarguably has a contractual relationship with the government and has retained little, if any, freedom to decide whether to fill orders pursuant to the PPV Contract." *Id.* at 11.

### C.     The Causal Nexus Requirement Is Satisfied.

20.     To establish a causal connection, the alleged conduct needs merely "a sufficient connection or association" to establish its relation to the act performed under color of office. *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (quotation marks omitted); *In*

---

[2]     *See* Veterans Affairs, Department of Operation and Logistics, Prime Vendor Division, https://www.va.gov/oal/business/nc/ppv.asp.

*re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015), *as amended* (June 16, 2015) (same).

21.     There is a causal nexus between the Tribe's claims and McKesson's acts under color of federal office. The Tribe's Petition alleges that McKesson "flood[ed] the market in and around the Osage Nation's Community with highly addictive opioids" and "persisted in a pattern of distributing commonly abused and diverted opioids in those areas in such quantities that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes." Pet. ¶¶ 172, 175.

22.     The Tribe's claims thus put at issue *all* prescription opioids diverted in and around the Tribal Area. This necessarily includes prescription opioids McKesson supplied to federal agencies as described above, including the IHS and VA. McKesson has therefore satisfied the causal nexus requirement. Exhibit 1 at 17 ("[T]he Tribe's claims put *all* prescription opioids at issue and allege that diversion can occur at *any* point in the supply chain, including those opioids supplied pursuant to the PPV contract. The issue here is whether McKesson's drug distribution was performed pursuant to a federal contract, and in this case it was.").

### D.      McKesson Has Colorable Federal Defenses.

23.     In construing the colorable federal defense requirement, the Supreme Court has "rejected a 'narrow, grudging interpretation' of the statute," and "do[es] not require the officer virtually to 'win his case before he can have it removed.'" *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).

24.     McKesson has a colorable federal defense in the form of the government contractor defense, which "protects government contractors from tort liability that arises as a result of the contractor's 'compli[ance] with the specifications of a federal government contract.'" *Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011) (quoting I*n re Hanford Nuclear Reservation Litig.*,

534 F.3d 986, 1000 (9th Cir. 2008)). *See also Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988). In denying remand in two substantially similar opioid-related cases brought by Native American tribes, Judge Polster ruled that "McKesson's distributions to the federal government pursuant to the PPV Contract are sufficient to demonstrate that the government contractor defense is plausible," and therefore this defense is "sufficient to meet the third prong of the federal officer removal analysis." Exhibit 1 at 19.

25.     McKesson also has a defense that the Tribe lacks standing to pursue its claims, which effectively attempt to challenge McKesson's compliance with the federal Controlled Substances Act, and its implementing regulations. The Petition seeks to hold McKesson liable at least in part for its alleged failure to halt shipments of suspicious orders. *See, e.g.*, Pet. ¶ 153 (alleging that distributors have a duty to "terminate orders if there are indications of diversion"). To the extent such a duty exists, it exists only under the federal CSA and related Drug Enforcement Administration regulations, which are interpreted to require that distributors either investigate or decline to ship a suspicious order. *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212-13 (D.C. Cir. 2017). The Tribe, therefore, effectively attempts to challenge McKesson's compliance with the CSA and its implementing regulations, but lacks standing to pursue its claim. The CSA does not create a private right of action and thus can be enforced only by federal authorities. *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 903-904 (10th Cir. 2017); *Durr v. Strickland*, 602 F.3d 788, 789 (6th Cir. 2010).

26.     Finally, McKesson also has a colorable federal preemption defense, to the extent that the Tribe's claims conflict with McKesson's duties under the CSA and its implementing regulations. For example, the Petition alleges that McKesson and other defendants had "a legal duty to act with the exercise of ordinary care or skill to prevent injury to another" and "breached this duty through their deceptive marketing campaign, distributions of opioids, and failure to divert

opioids from illicit channels." Pet. ¶¶ 209-10. In the heavily regulated pharmaceutical distribution industry, federal statutes and regulations provide the legal standard and control what constitutes "reasonable care" under most relevant circumstances. To the extent the Tribe's theory concerning what conduct is "reasonable" is inconsistent with the standard set forth by the CSA, the Tribe's claims are preempted. 21 U.S.C. § 903.

## II.   ALL PROCEDURAL REQUIREMENTS OF REMOVAL ARE SATISFIED.

27.     This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b)(2) and (3), because it is filed within thirty (30) days of service of the Petition on McKesson on August 2, 2019.

28.     In accordance with LCvR 81.2, a copy of the state court docket sheet is attached as **Exhibit 2**. In accordance with 28 U.S.C. § 1446(a), copies of all documents filed or served upon McKesson in the state court action are attached as **Exhibits 3-13**.

29.     Written notice of the filing of this Notice of Removal shall be promptly served on all parties herein, and a copy of this Notice shall promptly be filed with the Clerk of the District Court of Osage County, Oklahoma pursuant to 28 U.S.C. § 1446(d).

30.     Federal officer removal does not require all defendants to consent to join in the removal and effects the removal of the entire action. *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (stating that removal under § 1442 "allows a federal officer [or person acting under that officer] independently to remove a case to federal court even though that officer [or person acting under that officer] is only one of several named defendants"); *Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960) (holding removal of entire action occurs even "where, as here, some persons entitled to join in the removal petition did not").

31.     In filing this Notice, McKesson expressly reserves all defenses, including but not limited to those under Federal Rules of Civil Procedure 8(c) and 12(b).

WHEREFORE, McKesson gives notice that the above action now pending against it in the District Court of Osage County, Oklahoma, Case No. CJ-2019-135, is hereby removed from the above-referenced State Court to the United States District Court for the Northern District of Oklahoma.

Respectfully submitted,

Stuart D. Campbell, OBA #11246
Kaylee Davis-Maddy, OBA #31534
DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.
700 Williams Center Tower II
Two West Second Street
Tulsa, Oklahoma 74103-3522
Telephone 918-582-1211
Facsimile 918-591-5360
scampbell@dsda.com
kmaddy@dsda.com

*Counsel to Plaintiff McKesson Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2019, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to all listed ECF registrants. I further certify that the following parties are being served with a copy of this document, in accordance with the Federal Rules via CM/ECF, via email, or via mail, postage pre-paid:

Curtis "Muskrat" Bruehl
Matthew J. Sill
Harrison C. Lujan
FULMER SILL LAW GROUP
P.O. Box 2448
1101 N Broadway Ave., Suite 102
OKC, OK 73103

D. Michael McBride III
Susan E. Huntsman
Crowe & Dunlevy, PC
500 Kennedy Building
321 S. Boston Ave.
Tulsa, OK 74103

Ryan A. Ray
NORMAN WOHLGEMUTH CHANDLER
JETER BARNETT & RAY, PC
2900 Mid-Continent Tower
401 S. Boston Avenue
Tulsa, OK 74103

John H. Sparks
Michael W. Ridgeway
ODOM, SPARKS & JONES, PLLC
Suite 140
HiPoint Office Building
2500 McGee Drive
Norman, OK 73072

Stuart D. Campbell

5102865.1

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) |
| THIS DOCUMENT RELATES TO: | ) **MDL No. 2804** |
| *Cherokee Nation v. McKesson Corporation et al.,* Case No. 1:18-OP-45695 | ) **Case No. 17-md-2804** ) ) **Judge Dan Aaron Polster** |
| *Lac Courte Oreilles Band Of Lake Superior Chippewa Indians v. McKesson Corporation et al,* Case No. 1:18-OP-45932 | ) **OPINION AND ORDER** ) ) ) |

Before the Court are Plaintiffs' Cherokee Nation ("Cherokee") and Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("Lac Courte Oreilles") (collectively "the Tribes") Motions to Remand. **(1:18-OP-45695 Doc #: 12; 1:18-OP-45932 Doc #: 15)** The Court has reviewed the Motions, the Opposition Briefs, and the Reply Briefs of both cases and for the reasons to follow, **DENIES** both the Cherokee and the Lac Courte Oreilles Motions to Remand.

Additionally, for the reasons set forth below, Defendant McKesson Corporation's ("McKesson") Motion to Stay Execution of Any Remand Order pending in Case no. 1:18-OP-45695 (Doc #: 72) and Cherokee's Motion for Oral Argument pending in the same case (1:18-OP-45695 Doc #: 73) are also **DENIED**.

## I.    Introduction

In this Multidistrict Litigation ("MDL"), Plaintiffs are government entities, Indian tribes, hospitals, third-party payors and individuals from across the nation that have sued the

manufacturers, distributors and retailers of prescription opiate drugs, alleging they are liable for the costs Plaintiffs have incurred, and will continue to incur, in addressing the opioid public health crisis. There are now over 1150 cases in the MDL—53 of which were filed by Indian tribes.

A.   **Procedural History re:** *Cherokee Nation v. McKesson Corporation et al.***, Case No. 1:18-OP-45695**

On April 20, 2017, Cherokee filed a petition in the District Court of the Cherokee Nation against defendant opioid distributors and pharmacies. (*See* 1:18-OP-45695 Doc #: 12 at 3) The defendants, in turn, filed a declaratory judgment action in the District Court for the Northern District of Oklahoma on June 8, 2017 seeking to enjoin the tribal lawsuit. (*See Id.*) The Federal District Court granted defendants' motion for preliminary injunction on January 9, 2018. (*See Id.*)

Ten days later, on January 19, 2018, Cherokee filed this action in the District Court of Sequoyah County, Oklahoma. (1:18-OP-45695 Doc #: 2-1) Cherokee asserted solely state common law claims related to alleged actions and omissions of McKesson Corporation et al. that allowed opioid diversion to occur in the counties of Cherokee Nation in northeastern Oklahoma. On February 26, 2018 Defendant McKesson removed the case to the United States District Court for the Eastern District of Oklahoma alleging as its grounds for removal the Federal Officer Removal Statute, 28 U.S.C. § 1442. (1:18-OP-45695 Doc #: 2 at 2) McKesson subsequently filed a Notice of Potential Tag-Along Action relating to the present National Prescription Opiate MDL whereon the case was transferred to the Northern District of Ohio. (*See* 1:18-OP-45695 Doc #: 12 at 4; *see also* Doc #: 69)

B.   **Procedural History re:** *Lac Courte Oreilles Band Of Lake Superior Chippewa Indians v. McKesson Corporation et al***, Case No. 1:18-OP-45932**

Similarly, on March 16, 2018, Lac Courte Oreilles filed a Complaint in the Circuit Court of Sawyer County, Wisconsin against defendant opioid manufacturers, distributors, and pharmacies. (1:18-OP-45932 Doc #: 1-1 at 26-95) Lac Courte Oreilles similarly asserted only state

2

law claims. On April 19, 2018 McKesson removed the case to the United States District Court for the Western District of Wisconsin—again alleging as its grounds for removal the Federal Officer Removal Statute. (1:18-OP-45932 Doc #: 1 at 3) Here, Defendant Cardinal Health, Inc. filed a Notice of Potential Tag-Along Action relating to the present National Prescription Opiate MDL whereon the case was transferred to the Northern District of Ohio. (*See* 1:18-OP-45932 Doc #: 15 at 4; *see also* Doc #: 27)

## II.    Standard of Review

When a case is removed under the Federal Officer Removal Statute, the Court is free to use its own circuit's interpretation of the federal law to form its opinion. *See In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1186 (D.C. Cir. 1987) ("Nothing in the Supreme Court's opinion in *Van Dusen* nor in the language of section 1407(a) requires a federal court to engage in the unprecedented practice of interpreting federal law through the analytical prism of another circuit's case law.").Therefore, in deciding the present motions, the Court will apply Sixth Circuit case law to its analysis of the Federal Officer Removal Statute.

Title 28, Section 1442 of the U.S. Code permits the removal of a "civil action or criminal prosecution that is commenced in a State court and that is against or directed to . . . any officer (or any person acting under that officer) of the United States . . . in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442.[1] The Supreme Court has "made clear that the [Federal Officer Removal] Statute must be 'liberally construed.'" *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932); also citing *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) and *Willingham v.*

---

[1] In 1996, congress added the parenthetical "(or any person acting under that officer)" to broaden the scope of the Federal Officer Removal Statute. See *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 390 (6th Cir. 2007).

3

*Morgan*, 395 U.S. 402, 406–407 (1969)). The Federal Officer Removal Statute is unique in that it provides a right to appeal where a case removed under 28 U.S.C. § 1442 is subsequently remanded. *See* 28 U.S.C. § 1447(d). Although a liberal construction has limits, *see Watson*, 551 U.S. at 147, the Supreme Court's "policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of 28 U.S.C. § 1442(a)(1).'" *Manypenny*, 451 U.S. at 242 (internal citation omitted). While some circuits have taken a more narrow view of removal under the Federal Officer Removal Statute, the Sixth Circuit has endorsed "the broad scope of the federal officer removal statute," and thus this Court interprets the statute broadly in favor of removal in this instance.[2,3] *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 (6th Cir. 2010).

The purpose of federal officer removal jurisdiction is to ensure that federal officers can raise colorable federal defenses arising out of their duty to enforce federal law and are given the impartiality of a federal forum. *See Bennett*, 607 F.3d at 1085 (citing *Willingham*, 395 U.S. at 406-07). Federal officer removal requires a private corporate defendant to show that (1) it is a person who acted under the direction of a federal officer; (2) the actions for which it is being sued were performed under the color of federal office, and (3) there is a colorable federal defense to the plaintiff's claims. *See Id.*

---

[2] The Court notes that while federal officer removal jurisdiction pursuant to 28 U.S.C. § 1442, is entitled to a liberal construction in favor of removal, federal question jurisdiction pursuant to 28 U.S.C. § 1331 should be strictly construed against removal. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941); *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).

[3] *Compare Bennett*, 607 F.3d at 1084 (6th Cir. 2010) ("In *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969), the United States Supreme Court explained the broad scope of the federal officer removal statute"; *with Gragg v. Alfa Laval, Inc.*, No. CIV. 09-773-GPM, 2009 WL 4110389, at *4 (S.D. Ill. Nov. 20, 2009) ("although [federal officer removal] jurisdiction is read 'expansively' in suits involving federal officials, it is read narrowly where, as in this instance, only the liability of a private company purportedly acting at the direction of a federal officer is at issue.").

4

### III.     Analysis

#### A.     Acting Under

A private corporate defendant can show that it acted under the direction of a federal officer

in situations where "the relationship between the contractor and the Government is an unusually

close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153. For

example, private contractors have been found to be acting under the direction of a federal officer

when the contractor "is helping the Government to produce an item that it needs, [and] in the

absence of a contract with a private firm, the Government itself would have had to perform [the

contracted job]." *Id.* at 154 (citing as an example *Winters v. Diamond Shamrock Chemical Co.*,

149 F.3d 387 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors

that manufactured Agent Orange)). Therefore, while mere compliance with a government

regulation, even a strict one, is insufficient to find that a private company was acting under the

direction of a federal officer, delegation of specific government tasks meets the "acting under"

prong. *See generally id.*

The Sixth Circuit examined the "acting under" prong in its opinion in *Bennett v. MIS Corp.*

In *Bennett*, the FAA discovered mold, including toxic mold, in one of its control towers and

contracted with MIS, a private corporation, to treat and remove the mold. *See Bennett,* 607 F.3d at

1082-83. After completion of the mold removal project, Bennett filed suit against MIS in state

court for negligent execution of its mold remediation contract. MIS removed the case to the Eastern

District of Michigan under the Federal Officer Removal Statute. *See. id.* at 1083-84.

In its removal motion, MIS alleged that it was acting under the direction of a federal officer

because "'its work was performed at the direction of, and in accordance with, [ ] detailed mold

abatement specifications established by the FAA' and that '[t]he FAA provided detailed

[instructions] . . . pertaining to the materials that MIS was required to use and the manner in which

MIS was to perform the [mold] remedial activities.'" *Id.* at 1087. MIS attached the contract to its

removal motion. The Sixth Circuit, in its review of the contract,[4] found that the FAA contractually

required MIS to "follow explicit parameters for site containment and waste disposal," *id.*, and that

the FAA closely monitored MIS's work. The Court determined that the contract required an "FAA

contracting officer" to be on-site and that the officer: (1) could not modify contract procedures

without approval, (2) could dismiss incompetent MIS employees, (3) could control MIS employee

working hours, (4) must escort MIS employees at all times, and (5) could prohibit entry into the

site. *See id.* at 1087-88. This, the Sixth Circuit determined, "went beyond simple compliance with

the law," and therefore was "a job that, in the absence of a contract with [MIS] [or another private

mold remediation firm] the [FAA] itself would have had to perform." *Id.* at 1088 (distinguishing

the facts of *Bennett* from those in *Watson*) (internal quotations omitted).

     In the present cases, McKesson argues that it acted under the direction of a federal officer

because absent the PPV Contract, the VA would have to warehouse and distribute drugs itself, a

model it previously abandoned. In this way, McKesson argues, it helps the VA (and IHS) carry

out their duties of providing prescription drugs to the Cherokee Nation and the Lac Courte Oreilles

Band of Lake Superior Chippewa Indians. McKesson argues it has an unusually close relationship

with the government due to monitoring and oversight of the PPV Contract by a Contracting

Officer. Like MIS, McKesson performs a function that the VA would otherwise have to do itself

(and in fact did do prior to instituting the PPV program).

     McKesson cites sections I-1(a), (f)-(i), I-9, and I-18(i) of the PPV Contract for the

proposition that the "contract is heavily regulated, monitored, and supervised" and states that it

---

[4] "When a district court's subject matter jurisdiction is in question, it is empowered to review extra-complaint evidence and resolve factual disputes." *Bennett*, 607 F.3d at n.11 (citing *Rogers v. Stratton Indus. Inc.*, 798 F.2d 913, 915–16 (6th Cir.1986).

"cannot act (i.e. distribute) without the direction of the VA." (1:18-OP-45695 Doc #: 29 at 13) These sections specifically require McKesson to "maintain an adequate supply and distribute all drug/pharmaceutical . . . items and other contracted items," "provide [all items ordered] to the ordering facilities in accordance with the terms and conditions of the PPV contract," and "[u]pon request . . . coordinate large and bulk orders [of pharmaceuticals]." (1:18-OP-45695 Doc #: 29-3 at 13) (hereafter cited as "PPV Contract") These sections describe how McKesson is required to perform actions that the VA used to have to do itself, but do not on their face demonstrate the level of supervision and involvement the FAA had over MIS's actions in *Bennett*. For this, McKesson cites section I-18(i), which provides that "[t]he Government will witness products received at the loading docks (or specified delivery location) and sign delivery receipt documents before the PPV driver departs." (*Id.* at 40) This falls short of the level of supervision the FAA had over MIS in *Bennett*, however, there are factual differences between the contractual obligations of MIS in *Bennett* and those of McKesson here. In the present cases, McKesson does not need to fill pharmaceutical orders under the close scrutiny of the VA contracting officer because the PPV Contract provides recourse in the event the government is not satisfied with an order. (*See, e.g.*, *Id.* at 72) Additionally, although not based on McKesson's actions under the PPV Contract, there is evidence that McKesson's actions are heavily monitored and regulated. In January, 2017, the government imposed a $150 million fine on McKesson for, among other things, failing to "design and implement an effective system to detect and report 'suspicious orders' for controlled substances" in violation of the Comprehensive Drug Abuse Prevention and Control Act. (1:18-OP-45932 Doc #: 15-1 at 1)

The Tribes contend that the PPV Contract is insufficient to support federal officer removal. Cherokee cites *Creighton v. Fleetwood Enterprises, Inc.*, No. CIV.A. 07-7194, 2009 WL 1229793,

7

at *7 (E.D. La. May 5, 2009); *Joseph v. Fluor Corp.*, 513 F. Supp. 2d 664, 673 (E.D. La. 2007); and *Ohio ex rel. Rogers v. Sherwin-Williams Co.*, No. 2:08-CV-00079, 2008 WL 4279579, at *4 (S.D. Ohio Sept. 17, 2008) to support this assertion. Similarly, Lac Courte Oreilles cites *Brokaw v. Boeing Co.*, 137 F. Supp. 3d 1082 (N.D. Ill. 2015), *Custer v. Cerro Flow Prods.*, No. 09-514-DRH, 2009 WL 5033931 (S.D. Ill. 2009), and *Gragg v. Alfa Laval, Inc.*, Civil No. 09-773-GPM, 2009 WL 4110389 (S.D. Ill. 2009). These cases are distinguishable from the present case.

### 1.    Cases Cited by the Tribes are Distinguishable

In *Creighton*, plaintiff alleged that defendant negligently inspected plaintiff's FEMA supplied trailer, which subsequently exploded causing injury. Defendant removed the case to federal court under the Federal Officer Removal Statute citing the presence of a government contract to show that it was acting under the direction of a federal officer. The court disagreed, stating:

> The contract's Performance Work Statement specifies at the outset that it "establishes the minimum requirements for disaster area maintenance of temporary housing units." FEMA assumed authority over certain narrow areas, but there is no indication that FEMA intended to retain general responsibility for the details of implementation. To the contrary, the contract establishes a specific procedure through which FEMA's representative could issue written directives supplementing and clarifying the general contract provisions. The implication of this provision is that ARS was solely responsible for determining how to execute the contract in the absence of written directions. In addition, the contract contemplates that ARS would be "responsible for errors and omissions committed by it," except to the extent that FEMA caused or contributed to ARS's liability. All of these provisions suggest that, as a general matter, the parties intended for ARS to exercise discretion and independent judgment in the performance of its duties.

*Creighton,* 2009 WL 1229793, at *4 (internal citations omitted).

In *Creighton*, the defendant identified several contract provisions to demonstrate government control. The contract required them to set up and operate a toll-free maintenance number for trailer occupants and to obtain permission from FEMA before replacing any part worth more than $250. The court pointed out, however, that few of the "provisions [cited by defendant

8

to show government control] have any connection to [defendant's] allegedly tortious conduct." *Id.* at *5.

In the present case, McKesson was not given the level of broad discretion and independent judgment given to the defendants in *Creighton*. The tortious conduct in Creighton was negligent training and inspection of FEMA trailers, and the court found that the defendant in that case could not point to contract provisions that mandated how they train their personnel or inspect trailers. Instead, the court found the FEMA contract set minimum standards, and the defendant was permitted to meet those minimums at its discretion. Here, McKesson's allegedly tortious conduct is negligent distribution of opioids (i.e. diversion), and the PPV Contract deals specifically with how McKesson must distribute pharmaceuticals. (*See, e.g.*, PPV Contract at 13) ("All items ordered *shall* be provided to the ordering facilities *in accordance with the terms and conditions* of the PPV contract.") (emphasis added)

In *Joseph v. Fluor Corp.* (another case from the Eastern District of Louisiana involving FEMA trailers) the court determined that the contract for the FEMA trailers merely set "minimum standards for travel trailer construction and outfitting" and that "[t]he standards shall not be considered restrictive in that the supplier may provide "equal or better" units considering that the competitive price and delivery requirements can be met." *Joseph v. Fluor Corp.*, 513 F. Supp. 2d at 672 (quoting specific contract provisions). In the case at hand, McKesson is supplying pharmaceuticals pursuant to strict contractual requirements in a highly regulated industry.

*Ohio ex rel. Rogers*, in addition to being the only case cited from the Sixth Circuit, is easily distinguishable. In *Ohio ex rel. Rogers*, the court found that defendant seeking removal "was unable to establish a direct contractual relationship with the federal government and therefore failed to establish the special relationship with the federal government required to fulfill the 'acting

under' requirement." *Ohio ex rel. Rogers*, 2008 WL 4279579, at *2. In this case, it is uncontested that McKesson has a contractual relationship with the government.

Cherokee also identifies the recent Sixth Circuit decision in *Mays v. City of Flint, Mich.*, 871 F.3d 437 (6th Cir. 2017) for the proposition that a private contractor is not "acting under" the direction of a federal officer when, for example, a government contract allows for the contractor's discretion to act pursuant to that contract. Here, Cherokee argues, McKesson had discretion to "investigate suspicious opioid orders, refuse to fill them, and make reports for further investigation." (1:18-OP-45695 Doc #: 36 at 7) In other words, Cherokee argues that McKesson could choose not to fill orders at its discretion. This is not entirely accurate.

Although the PPV Contract does state that "The Contractor is not required to fill an FSS[5] order (or that portion an order) that investigational facts suggest will be diverted into the commercial market or will otherwise be diverted from usage by authorized FSS ordering activities," (PPV Contract at 80), it goes on to state "However, the Contractor may not unreasonably delay filling an FSS order, pending its investigation of the intended use of the items ordered." (*Id.*) Further, the PPV Contract goes on to provide a procedure for the Contracting Officer ("CO") to review any such decisions made by the PPV Contractor, and also provides that "the CO may instruct the Contractor to fill an executive-agency-level order and/or resume acceptance of executive agency indirect orders." (*Id.*) The PPV Contract further provides that "No authorized FSS ordering activity may be suspended from eligibility under the Schedule by any Contractor, except on the written instruction of the Schedule CO." (*Id.*) The implication of these contract provisions is that although there is some limited discretion to conduct an investigation

---

[5] Federal Supply Schedule

10

into potential diversion, McKesson ultimately had little discretion whether to fill an order, and could not unilaterally choose to not fill a government order or otherwise suspend an FSS.

*Mays* is distinguishable for similar reasons to those in *Ohio ex rel. Rogers*. In *Mays*, the Michigan Department of Environmental Quality ("MDEQ") was the primary enforcement authority over the Safe Drinking Water Act ("SDWA"). The MDEQ, a state agency, claimed that absent its primary enforcement authority over the SDWA, the EPA, a federal agency, would have to enforce the SDWA itself. *Mays*, 871 F.3d at 444. The Court acknowledged that MDEQ received funds from EPA, but found that alone was insufficient to establish a delegation of legal authority that would give rise to a state agency's ability to invoke the Federal Officer Removal Statute. *Id.* at 444-45. In effect, the Sixth Circuit was indicating that MDEQ was not a government contractor.

The Sixth Circuit noted that "a government contractor entitled to removal would presumably be contractually required to follow the federal government's specifications in making products or providing services." *Id.* at 445. The Sixth Circuit agreed with the district court's conclusion that MDEQ had shown "no contract, no employer/employee relationship, nor any other indication of a principal/agent arrangement between the MDEQ and the EPA," *id.* at 444, and concluded that "the receipt of federal funding alone cannot establish a delegation of legal authority because finding such a delegation on that basis is way beyond the reasoning of *Watson* and would allow myriad state agencies to invoke federal-officer removal." *Id.* at 444-45. Thus, the court concluded "the state retain[ed] the freedom to enforce its own safe-drinking-water laws and regulations," and was not "acting under" the EPA for the purpose of invoking the Federal Officer Removal Statute. In the present case, McKesson inarguably has a contractual relationship with the government and has retained little, if any, freedom to decide whether to fill orders pursuant to the PPV Contract.

11

In *Brokaw*, defendants were moving military cargo pursuant to a contract with the U.S. Government when some of the cargo broke loose from its holds, penetrated a pressure bulkhead of the Boeing 747 that was transporting it, and caused the plane to crash. *Brokaw*, 137 F. Supp. 3d at 1088. Defendants removed the case under the Federal Officer Removal Statute stating that they were "'carrying out duties pursuant to a contract with the United States Government,' and because 'the military was directly involved in loading the aircraft and controlled the details of the cargo transport operation, including, but not limited to, the type and quantity of military cargo being transported, and the starting point and final destination for such cargo deliveries.'" *Id.* at 1097 (quoting defendants' response brief). The court determined that removal was not proper because "[a]lthough [the defendant] was performing (at least indirectly) under a defense contract and was flying in a military zone, at bottom it was engaged in the simple act of moving cargo. *Id.* The court found that the defendant "had significant discretion in deciding how to perform its duties under the contract," *id.*, and cited the contract as providing that "Multiple modes (i.e. airlift, sealift, linehaul) of transportation may be used to move cargo to/from multiple zones globally."

*Brokaw* is distinguishable based on the contractual obligations and the amount of discretion given to the government contractor to fulfil those obligations. In *Brokaw*, the action at issue pursuant to the contract was the transportation of the equipment. The military wanted its equipment moved from point A to point B, and provided the defendant a lot of discretion on how to do that. Here, the action at issue pursuant to the contract is not the transportation of the drugs, but the filling of specific orders received from its government customers. In that regard, McKesson, as discussed below, did not have the discretion, under the contract, to unilaterally refuse to fill orders based on its concerns about potential diversion, nor could it ship pharmaceuticals that were not actually ordered.

12

*Custer*, like the other cases discussed, is distinguishable due to the amount of discretion given to the defendants in that case. *Custer* involved a suit for liability over the release of hazardous substances at three sites. *Custer*, 2009 WL 5033931, at *1. The defendants removed the case under the Federal Officer Removal Statute alleging they were acting under the direction of a federal officer because they were contractually obligated to produce chemicals, including Agent Orange and polychlorinated biphenyls ("PCBs"), for the government. *Id.* at *2. The court stated that:

> Defendants argue that the government contracts required them to dispose of wastes in a fashion required by the government. However, Defendants have not pointed to any government requirement that prevented them from handling and disposing of the PCBs with care. While they argue that the CWS contracts required them to dispose of materials in a certain fashion, they have pointed to no such requirement or mandated specifications as to disposal.

*Id.* at *4. The defendants in *Custer* had discretion regarding how they disposed of the PCBs, or at least were not directed to be careless. Here again, McKesson's discretion, with respect to their performance under the PPV Contract, is limited. When the government submits an order under the contract, McKesson is obligated to fill the order. Further, as discussed above, McKesson has only limited ability to refuse, and even when they refuse to fill an order, that decision is ultimately at the discretion of the federal contracting officer. (*See* PPV Contract at 80)

*Gragg* is inapplicable. In *Gragg* the court decided to remand the case to state court because, in the court's opinion, the defendant had failed to "put forward sufficient evidence even to raise an inference of a colorable federal defense." *Gragg*, 2009 WL 4110389, at *4. Despite this, Lac Courte Oreilles cites a passage that again illustrates an important distinction in the level of discretion Foster Wheeler had in designing its warnings in *Gragg*, versus the discretion McKesson has in refusing to fill orders here. Lac Courte Oreilles identifies that the court in *Gragg* found that "even assuming . . . the [United States Navy] exercised the final control over the content of the warnings that accompanied the equipment supplied to it by Foster Wheeler, this does not negative

13

the possibility that Foster Wheeler had responsibility for designing the warnings, in whole or in part." *Id.* This presumed degree of control exercised by Foster Wheeler was evidence cited by the court to reject Federal Officer Removal.

### 2.   The PPV Contract Required McKesson to Distribute Opioids Pursuant to Its Terms

The Tribes argue that McKesson could not have been acting under the direction of a federal officer because McKesson was in breach of its contractual obligations not to divert opioids. This argument is faulty for two reasons. First, it rests upon the conclusion that McKesson was in fact allowing the diversion of opioids in violation of the PPV Contract, which is merely an allegation and remains unproven until trial. Second, it confuses the analyses of the "acting under" and "causal nexus" prongs.

The Tribes argue that the PPV Contract did not *require* McKesson to engage in opioid diversion, and in fact specifically forbade it. This is of course, true. The government did not direct McKesson to engage in opioid diversion. The government did, however, direct McKesson to distribute pharmaceuticals pursuant to the PPV Contract. The Tribes allege that McKesson filled suspicious orders in violation of the PPV Contract's express mandates to comply with state and federal laws. According to the Tribes, if the PPV Contract forms the basis for McKesson's argument that it was acting under the direction of a federal officer, and McKesson was in violation of that contract, then McKesson could not have been acting under the direction of a federal officer. This argument relies, however, on the conclusion that McKesson was engaged in opioid diversion in breach of the PPV Contract. The "acting under" prong, however, is not concerned with the specific actions actually taken by McKesson, but rather asks whether McKesson was directed by a federal officer, pursuant to a legal obligation, to perform a task that otherwise the government

14

would be required to do. In other word, the "acting under" prong merely examines the relationship between the defendant and the federal government.

The Tribes' assertions that McKesson's actions allowed opioid diversion to occur in breach of the PPV Contract implicates the "causal nexus" prong. Diversion of opioids either occurred or did not occur as a direct result of McKesson's obligation to fill orders under the PPV Contract. The "causal nexus" prong, analyzed further below, examines McKesson's actions taken pursuant to the PPV Contract. The analysis examines whether there is a connection between those actions and the opioid diversion that forms the basis of Cherokee complaint. The Tribes' assertions that McKesson filled orders that it knew or should have known would be diverted highlights the connection between McKesson's actions (filling and distributing opioid orders) and the Tribes' claims (diversion). This is a "causal nexus" argument. It is not an argument that McKesson was not acting under the direction of a federal officer.

The issue for the "acting under" prong is whether McKesson's relationship with the government was sufficiently close to warrant a federal forum. As described above, in *Bennett*, the Sixth Circuit found that MIS was acting under the direction of a federal officer. The Court determined that the contracts in that case included 1) precise specifications, *see Bennett*, 607 F.3d at 1087, 2) close monitoring of MIS's work by federal officers, *see id.*, and 3) "MIS help[ing] FAA officers carry out their task of ridding a federal employee occupied building of an allegedly hazardous contaminant—'a job that, in the absence of a contract with [MIS] [or another private mold remediation firm] the [FAA] itself would have had to perform.'" *Id.* at 1088 (quoting *Watson*, 551 U.S. at 153). Here, first of all, McKesson was subject to the precise specifications of the PPV Contract with regard to quality and ordering, (*see* PPV Contract at 11) Secondly, the administration of the PPV Contract was overseen by a federal government contracting officer who had final say

15

over whether McKesson could choose not to fill an order. *See Id.* at § AS3023. And finally, absent McKesson's distribution pursuant to the PPV Contract, the VA would have to warehouse and distribute drugs itself, a job it formerly did but abandoned in favor of the PPV Program.

Although the level of supervision falls short of the specific factual circumstances present in *Bennett*, the Sixth Circuit determined that the test when analyzing "whether a private firm is 'help [ing]' or 'assist[ing]' a federal officer, such that its assistance satisfies the 'acting under' requirement [is whether] . . . '[t]he assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'" *Bennett*, 607 F.3d at 1086 (quoting *Watson*, 551 U.S. at 153-54). This is undoubtedly a close call, but under the specific factual circumstances of these cases and the liberal construction of the Federal Officer Removal Statute mandated by the Supreme Court, the Court finds that the assistance McKesson provides to the VA goes beyond simple compliance and helps the government perform basic tasks. Therefore, McKesson was acting under the direction of a federal officer for the purposes of the Federal Officer Removal Statute.

### B.    Causal Nexus

The second prong requires the party seeking removal to show that the actions for which it is being sued were performed under the color of federal office. "To satisfy th[is] requirement, [McKesson] must show a nexus, a 'causal connection' between the charged conduct and [the] asserted official authority." *Bennett*, 607 F.3d at 1088 (quoting *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999)). That is, there must be some causal nexus between the plaintiff's claims and the private party's actions committed under the direction of the federal government. *See Watson*, 551 U.S. at 148. "The hurdle erected by this requirement is quite low." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (citing *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926)).

The Tribes argue that there is no causal nexus between their assertions that McKesson engaged in opioid diversion and the actions McKesson performed under the contract, or at least that McKesson should be estopped from making the argument that there is a causal nexus because of arguments McKesson made in contesting tribal court jurisdiction. The Tribes also argue that McKesson's distribution to the VA and IHS (i.e. the distribution that occurred pursuant to the PPV Contract) are not at issue because they did not specifically allege that any of the diverted opioids came from tribal healthcare facilities. However, the Tribes' claims put *all* prescription opioids at issue and allege that diversion can occur at *any* point in the supply chain, including those opioids supplied pursuant to the PPV contract. The issue here is whether McKesson's drug distribution was performed pursuant to a federal contract, and in this case it was.

The causal nexus relationship required for federal officer removal depends on whether the actions of the defendant under the direction of a federal officer are causally linked to the claims the plaintiff is making. Here, the Tribes are claiming that McKesson engaged in opioid diversion, and further assert that opioid diversion occurs "when distributors fill suspicious orders of opioids from retailers or prescribers." (1:18-OP-45695 Doc #: 2-1 at 9-10), *see also* (1:18-OP-45932 Doc #: 1-1 at 40) Thus, there is a causal nexus between McKesson's action under the direction of a federal officer (filling orders pursuant to the PPV contract) and Cherokee's claim of opioid diversion (that McKesson knew or should have known that the orders were suspicious and should not have filled them).

McKesson should only be estopped from making its nexus argument if the "issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982).

17

The test for tribal court jurisdiction requires a consensual relationship between the tribe and the tribal court defendant, and then asks whether the litigation arose from that relationship. *See generally, Montana v. United States*, 450 U.S. 544, 565 (1981). The test for causal nexus under the Federal Officer Removal Statute on the other hand requires the actions performed under direction of a federal officer be causally linked to the plaintiff's claims. The precise issue of whether there is a causal link between McKesson and either Tribes' asserted claims (i.e. the issue of federal subject matter jurisdiction under the Federal Officer Removal Statute) is different from whether or not there was a consensual relationship between McKesson and the Cherokee Nation, and whether Cherokee's suit against McKesson arose from that relationship (i.e. the issue of tribal court jurisdiction over non-tribal parties). McKesson should not be estopped from arguing that there is a causal nexus.

## C.    Colorable Federal Defenses

The final prong requires that the party seeking removal must assert a colorable federal defense. This prong also erects a low bar and merely requires that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v. California*, 489 U.S. 121, 129-30 (1989). For example, the Sixth Circuit has stated that "a colorable federal defense need only be plausible, and that a district court is not required to determine its validity at the time of removal." *Bennett*, 607 F.3d at 1089 (citing *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007)) (internal citation omitted). In *Bennett*, the Sixth Circuit specifically addressed whether the government contractor defense was available to non-military service contractors and found that it was. *See Id.* at 1091.

McKesson asserts that it has colorable federal defenses, including the government contractor defense. Cherokee asserts that McKesson does not have a colorable federal defense in its Motion to Remand, but does not readdress the issue in its reply brief. This is likely because the

18

"colorable federal defense" prong has been determined to erect a relatively low bar. *See Bennett*, 607 F.3d at 1089 ("we have stated that a colorable federal defense need only be plausible, and that a district court is not required to determine its validity at the time of removal"). The Sixth Circuit goes on to explain that "it is at least plausible that the government contractor defense could apply outside the military procurement contract context." *Id.* at 1090.

The government contractor defense applies when: "(a) the United States approved reasonably precise specifications; (b) the equipment conformed to those specifications; and (c) the supplier warned the United States about dangers in the use of the equipment known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 501 (1988). The Court need not determine whether McKesson meets the requirements set forth in *Boyle* only that it is plausible that they could.

Here, it is plausible that the PPV Contract shows that the United States approved reasonably precise specifications and that McKesson's deliveries conformed to those specifications. Regarding the third "warning" prong of *Boyle*, McKesson can plausibly argue that it was aware of no greater danger than the government was already aware of. Therefore, McKesson's distributions to the federal government pursuant to the PPV Contract are sufficient to demonstrate that the government contractor defense is plausible. Because the "colorable federal defenses" prong is a low bar, McKesson's arguments that it is asserting colorable federal defenses for the purpose of federal officer removal are well taken. McKesson has asserted at least one colorable federal defenses sufficient to meet the third prong of the federal officer removal analysis.

**D.     The Policy Implications of Denying the Tribes' Motions**

Cherokee argues that if the Court were to deny its motion to remand, that it would set a precedent that would allow McKesson to use the Federal Officer Removal Statute to remove cases brought by the States in state court to federal court despite this Court's previous statements that it

does not have jurisdiction over State Attorneys General who bring state based claims in state court. However, to date McKesson has not removed or attempted to remove any cases brought by a State Attorney General on behalf of his or her State on the basis of the Federal Officer Removal Statute. Furthermore, while McKesson initially removed the case brought by the Commonwealth of Kentucky, McKesson subsequently consented to the remand of that case back to state court.[6]

The court recognizes that this is a close case and construes McKesson's removal arguments very narrowly as applicable only to the specific facts of these two cases. The Court is persuaded by the Supreme Court's mandate to give the Federal Officer Removal Statue a liberal interpretation and also swayed by the fact that all of the other Native American Tribe cases have been removed to federal court and transferred to the Opioid Crisis MDL, or were filed directly in federal court. As of August 31, 2018, there are 51 Indian Tribe lawsuits consolidated in the MDL, and besides Cherokee and Lac Courte Oreilles, no other tribes have filed remand motions, and if they did, the tribe subsequently withdrew its motion. The Court believes this is in part due to recognition on the part of the tribes that it is in their individual and collective best interest to be part of the MDL.

## IV.    Conclusion

Accordingly, the Motions to Remand filed by plaintiffs Cherokee Nation and Lac Courte Oreilles Band of Lake Superior Chippewa Indians (1:18-OP-45695 Doc #: 12; 1:18-OP-45932 Doc #: 15) are hereby **DENIED**.

On July 26, 2018 McKesson filed a Motion for an Order Directing the Clerk of the Court to Stay Execution of Any Remand Order for 14 Days Pursuant to Fed. R. Civ. P. 62(a). Because the Court has denied Cherokee's Remand Motion for the preceding reasons, McKesson's Motion to Stay Execution of Any Remand Order is **DENIED** as moot.

---

[6] *Commonwealth of Kentucky, ex rel. Andy Beshear Attorney General v. McKesson Corporation*, Case No. 1:18-op-45682 (E.D. Ky.) was removed under federal question jurisdiction.

On August 9, 2018 Cherokee filed a Motion for Oral Argument on its Motion for Remand. The Court has discretion regarding whether to grant oral arguments, and in this case the Court feels that the parties' positions were adequately briefed and that no oral argument will be necessary for the Court to make a determination. Therefore, Cherokees' Motion for Oral Argument is **DENIED**.

The Tribes also move for an award of costs and fees. Because the Court finds it does have subject matter jurisdiction over the Tribes' cases, Cherokee's and Lac Courte Oreilles' motions for costs and fees are also **DENIED**.

IT IS SO ORDERED.


*/s/Dan Aaron Polster  9/4/2018*
**Dan Aaron Polster**
**United States District Judge**

21

# EXHIBIT 2

## Case Information

# OSAGE NATION vs. PURDUE PHARMA L.P.,

| | |
|---|---|
| *Case Identifier* | Osage OK — CJ-2019-00135 |
| *Type of Case* | Civil Cases in which the relief sought exceeds $10,000 |
| *Date Filed* | 07/26/2019 |
| *Amount Owed* | $0.00 (as of 09/03/2019 11:16am) |

## Offense or Cause

# PUBLIC NUISANCE

## Parties Involved

| | |
|---|---|
| **Judge** | TATE, STUART *of Pawhuska OK* |
| **Plaintiff** | OSAGE NATION *of Pawhuska OK* |
| **Attorney** | RAY, RYAN A. *of Tulsa OK* |
| **Defendant** | PURDUE PHARMA L.P., |
| **Defendant** | PURDEU PHARMA INC |
| **Defendant** | THE PURDUE FREDERICK CO |
| **Defendant** | CEPHALON INC |
| **Defendant** | TEVA PHARMACEUTICAL INDUSTRIES LTD |
| **Defendant** | TEVA PHARMACEUTICALS US INC |
| **Defendant** | JANSSEN PHARMACEUTICALS INC |
| **Defendant** | ENDO HEALTH SOLUTIONS INC |
| **Defendant** | ENDO PHARMACEUTICALS INC |
| **Defendant** | PAR PHARMACEUTICALS INC |
| **Defendant** | ALLERGAN PLC F/K/A |
| **Defendant** | ACTAVIS PLC |
| **Defendant** | WATSON PHARMACEUTICALS INC |
| **Defendant** | WATSON LABORATORIES INC |
| **Defendant** | ACTAVIS PHARMA INC |
| **Defendant** | WATSON PHARMA INC |
| **Defendant** | ACTAVIS LLC |
| **Defendant** | MALLINCKRODT PLC |
| **Defendant** | MALLINCKRODT LLC |
| **Defendant** | SPECGX, LLC |
| **Defendant** | MYLAN PHARMACEUTICALS INC |
| **Defendant** | SANDOZ, INC |
| **Defendant** | MCKESSON CORP. |
| **Defendant** | CARDINAL HEALTH INC |
| **Defendant** | AMERISOURCEBERGEN CORP |
| **Defendant** | WALGREENS BOOTS ALLIANCE, INC |

| | |
|---|---|
| **Defendant** | MORRIS & DICKSON CO LLC |
| **Defendant** | WAL-MART STORES INC *of Bentonville AR* |
| **Defendant** | MCQUEARY BROTHERS DRUG CO, LLC |
| **Defendant** | SAJ DISTRIBUTORS |

## Case entries

| Date | Description | Amount | Images |
|---|---|---|---|
| 07/26/2019 | PETITION | $163.00 | 71 images |
| | (Entry with fee only) | $6.00 | |
| | (Entry with fee only) | $7.00 | |
| | (Entry with fee only) | $25.00 | |
| | LENGTHY TRIAL FUND FEE | $10.00 | |
| | OK COURT APPOINTED SPECIAL ADVOCATES | $5.00 | |
| | 10% OF CASA TO COURT CLERK REVOLVING FUND | $0.50 | |
| | OK COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND | $1.55 | |
| | 10% OF COJC TO COURT CLERK REVOLVING FUND | $0.16 | |
| | COURTHOUSE SECURITY FEE | $10.00 | |
| | 10% OF CHSC TO COURT CLERK REVOLVING FUND | $1.00 | |
| | STATE JUDICIAL REV. FUND INTERPRETER & TRANSLATOR SERVICES | $0.45 | |
| | 15% TO DISTRICT COURT REVOLVING FUND | $2.48 | |
| 07/26/2019 | SUMMONS ISSUED BACK TO ATTY FOR SERVICE ON THE PURDUE FREDERICK CO | $10.00 | 1 image |
| 07/26/2019 | SUMMONS ISSUED BACK TO ATTY FOR SERVICE ON AMERISOURCEBERGEN CORP | $10.00 | 1 image |
| 07/26/2019 | SUMMONS ISSUED BACK TO ATTY FOR SERVICE ON PURDUE PHARMA LP | $10.00 | 1 image |
| 07/26/2019 | SUMMONS ISSUED BACK TO ATTY FOR SERVICE ON CARDINAL HEALTH | $10.00 | 1 image |
| 07/26/2019 | SUMMONS ISSUED BACK TO ATTY FOR SERVICE ON PURDUE PHARMA INC | $10.00 | 1 image |
| 07/26/2019 | SUMMONS ISSUED BACK TO ATTY FOR SERVICE ON JOHNSON & JOHNSON | $10.00 | 1 image |
| 07/26/2019 | SUMMONS ISSUED BACK TO ATTY FOR SERVICE ON MCKESSON CORP | $10.00 | 1 image |
| 08/07/2019 | APPLICATION TO WITHDRAW AS COUNSEL OF RECORD | | 2 images |
| 08/07/2019 | ORDER GRANTING APPLICATION TO WITHDRAW AS COUNCEL OF RECORD | | 1 image |
| 08/16/2019 | ATTORNEY ENTRY OF APPEARANCE FOR AMERISOURCEBERGEN DRUG CORPORATION | | 2 images |
| 08/19/2019 | ENTRY OF APPEARANCE- RYAN A RAY FOR DEFT CARDINAL HEALTH | | 2 images |
| 08/19/2019 | ENTRY OF APPEARANCE- STUART CAMPBELL FOR DEFT MCKESSON CORP | | 3 images |
| 08/19/2019 | ORDER GRANTING DEFT'S UNOPPOSED MOTION TO SUBSTITUTE PARTY AND FOR ENLARGEMENT OF TIME TO ANSWER MOVE OR OTHERWISE RESPOND | | 3 images |
| 08/22/2019 | MANUFACTURER DEFTS' MOTION FOR ENLARGEMENT OF TIME IN WHICH TO ANSWER, MOVE, OR OTHERWISE RESPOND TO THE OSAGE NATION'S PETITION | | 11 images |
| 08/23/2019 | ORDER GRANTING MANUFACTURER DEFTS' MOTION FOR ENLARGEMENT OF TIME TO ANSWER, MOVE, OR OTHERWISE RESPOND | | 2 images |
| **Grand Total** | | **$302.14** | |

# Receipts

| Date | Description | Amount |
|------|-------------|--------|
| 07/26/2019 | Receipt R1-154517 received of RIGGS ABNEY NEAL TURPEN ETAL | $232.14 |
| 07/26/2019 | Receipt R1-154518 received of RIGGS ABNEY NEAL TURPEN ETAL | $70.00 |
| **Grand Total** | | **$302.14** |

# EXHIBIT 3

## IN THE DISTRICT COURT OF OSAGE COUNTY
## STATE OF OKLAHOMA

THE OSAGE NATION,

                    Plaintiff,

v.

(1) PURDUE PHARMA L.P.,
(2) PURDUE PHARMA INC.,
(3) THE PURDUE FREDERICK COMPANY,
(4) CEPHALON, INC.,
(5) TEVA PHARMACEUTICAL INDUSTRIES, LTD.,
(6) TEVA PHARMACEUTICALS USA, INC.,
(7) JANSSEN PHARMACEUTICALS, INC.,
(8) JOHNSON & JOHNSON,
(9) ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS,
     INC.,
(10) JANSSEN PHARMACEUTICA, INC.,
(11) ENDO HEALTH SOLUTIONS INC.,
(12) ENDO PHARMACEUTICALS INC.,
(13) PAR PHARMACEUTICAL, INC.,
(14) ALLERGAN PLC,
(15) ACTAVIS PLC,
(16) WATSON PHARMACEUTICALS, INC.,
(17) WATSON LABORATORIES, INC.,
(18) ACTAVIS PHARMA, INC.,
(19) WATSON PHARMA, INC.,
(20) ACTAVIS LLC,
(21) MALLINCKRODT PLC,
(22) MALLINCKRODT LLC,
(23) SPECGX, LLC,
(24) MYLAN PHARMACEUTICALS INC.,
(25) SANDOZ, INC.,
(26) MCKESSON CORP.,
(27) CARDINAL HEALTH, INC.,
(28) AMERISOURCEBERGEN CORP.,
(29) WALGREENS BOOTS ALLIANCE, INC. a/k/a
     WALGREEN CO.,
(30) MORRIS & DICKSON CO, LLC,
(31) WAL-MART INC. f/k/a WAL-MART STORES INC.,
(32) MCQUEARY BROTHERS
     DRUG COMPANY, LLC, and
(33) SAJ DISTRIBUTORS,

                Defendants.

Case No.: CJ-19-135

**PETITION**

District Court Osage County, Okla.
FILED

JUL 26 2019

Jennifer Burd, Court Clerk
By_____ Deputy

## INTRODUCTION

1.      Opioids are highly addictive, habit-forming drugs and always have been since their inception. That is why, for centuries, medical professionals employed opium-based drugs with caution and only prescribed them in limited circumstances to patients with cancer, terminal illnesses, or acute short- term pain.

2.      Defendants manufacture and sell opioids and, therefore, the limited uses for which doctors prescribed them were undermining each Defendant's bottom line. Defendants wanted to increase their opioid sales. And increase them they did. For example, from 1996 to 2000, OxyContin sales rose from $48 million to more than $1 billion. By 2009, OxyContin retail sales reached $3 billion.

3.      One way to sell more opioids was to expand the market beyond a niche for cancer patients, the terminally ill, and acute short-term pain and persuade medical professionals to prescribe more opioids to a broader range of patients with chronic non-cancer related pain. To convince medical professionals to do so, Defendants elected to falsely downplay the risk of opioid addiction and overstate the efficacy of opioids for more wide-ranging conditions, including chronic non-cancer pain.

4.      Over a period of several years, Defendants executed massive and unprecedented marketing campaigns through which they misrepresented the risks of addiction from their opioids and touted unsubstantiated benefits. To encourage physicians to prescribe more opioids, Defendants event went so far as to tell prescribers that classic signs of addiction should actually be treated with *more* opioid use because they were signs of "pseudoaddiction" which meant the patient was supposedly experiencing undertreated pain.

5.      The damage Defendants' false and deceptive marketing campaigns caused to the Osage Nation is catastrophic. The death rate for heroin overdoses among Native Americans has

2

skyrocketed, rising 236 percent from 2010 to 2014. This trend is particularly pronounced in Oklahoma, which is home to numerous Native American tribes, including the Osage Nation. Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009 as the leading cause of accidental death in the State. Oklahoma is one of the leading states in prescription painkiller sales per capita, with 128 painkiller prescriptions dispensed per 100 people in 2012. And, according to 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed per adult resident with approximately 877 milligrams of opioids distributed per adult resident.

6.      A November 2017 government study by the Council of Economic Advisers, an agency within the Executive Office of the President, estimated that the national economic impact of the opioid addiction epidemic was $504 billion in 2015. As a result of Defendants' egregious conduct, the Osage Nation has seen its healthcare services overwhelmed and its costs to provide a wide range of social services skyrocket from prescription opioid dependency. These costs include medical and therapeutic care; costs for social services for those suffering from opioid addiction, overdose, or death; counseling, treatment, and rehabilitation services; treatment of infants born with opioid-related medical conditions; welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation; and law enforcement and public safety relating to the opioid epidemic within its tribal community. The Osage Nation has also seen its workforce ravaged by opioid dependency, causing loss of productivity and attendant costs to the Osage Nation.

7.      Plaintiff, the Osage Nation, seeks to recover for the damages caused by Defendants' wrongdoing and abate the continuing opioid addiction epidemic created by Defendants' wrongful and unlawful conduct. As such, the Osage Nation, upon personal knowledge as to its own acts and beliefs, and upon information and belief as to all other matters based upon the investigation of counsel, alleges as follows:

3

## II.   THE PARTIES

### A.   Plaintiff

8.   The Osage Nation ("Osage Nation") is a sovereign Indian Tribe recognized by federal, state, and tribal law. The Osage Nation's jurisdictional territory encompasses Osage County, Oklahoma. The Osage Nation is not a citizen of any state for purposes of diversity jurisdiction.

9.   The Osage Nation exercises inherent and constitutional governmental authority on behalf of the Tribe itself and its members. The Osage Nation brings this action on its own behalf and on behalf of its members and citizens in the public interest to protect the health, safety, and welfare of the citizens of Osage Nation. The Osage Nation brings this action in an effort to address the opioid addiction epidemic within the Osage Nation and to recover damages and seek other redress for the harms caused by Defendants' conduct.

### B.   Pharmaceutical Defendants

10.   The Pharmaceutical Defendants are defined below. At all relevant times, the Pharmaceutical Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of prescription opioid drugs. The Pharmaceutical Defendants, at all times, have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

11.   PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware. Its partners are Purdue Pharma Inc., a citizen of New York and Connecticut, and Purdue Holdings L.P. Purdue Holdings L.P.'s partners are Purdue Pharma Inc., a citizen of New York and Connecticut; PLP Associates Holdings Inc., a citizen of New York and Connecticut; and PLP

4

Associates Holdings L.P. PLP Associates Holdings L.P.'s partners are PLP Associates Holdings Inc., a citizen of New York and Connecticut; and BR Holdings Associates L.P. BR Holdings Associates L.P.'s partners are BR Holdings Associates Inc., a citizen of New York and Connecticut; Beacon Company; and Rosebay Medical Company L.P. Beacon Company's partners are Stanhope Gate Corp., a citizen of the British Virgin Islands and Jersey, Channel Islands; and Heatheridge Trust Company Limited, a citizen of Jersey, Channel Islands. Rosebay Medical Company L.P.'s partners are Rosebay Medical Company, Inc., a citizen of Delaware and Oklahoma; R. Sackler, a citizen of Texas; and J. Sackler, a citizen of Connecticut. PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (Purdue Pharma L.P., Purdue Pharma Inc., and the Purdue Frederick Company are referred to collectively as "Purdue").

12.     Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the U.S., including Oklahoma. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers). Purdue has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

13.     CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a wholly owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business

in Pennsylvania. Teva USA acquired Cephalon, Inc. in October 2011.

14.    Cephalon, Inc. manufactures, promotes, sells and distributes opioids such as Actiq and Fentora in the U.S., including in Oklahoma. The Federal Drug Administration ("FDA") approved Actiq and Fentora only for the management of breakthrough cancer pain in patients who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million in fines and civil settlement amounts.

15.    Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon, Inc. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon- branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon, Inc. opioids, discloses that the guide was published by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon, Inc. to disclose that it is a wholly owned subsidiary of Teva Ltd. on prescription savings cards, indicating Teva Ltd. would be responsible for covering certain co-pay costs. All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva's USA's sales as its own, and its year-end report for 2012 – the year immediately following the Cephalon acquisition – attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales." Teva Ltd. operates in Oklahoma and the rest of the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets,

6

representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Pharmaceuticals Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to collectively as "Cephalon"). Cephalon has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

16.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. ORTHO-MCNEIL- JANSSEN PHARMACEUTICALS, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are referred to collectively as "Janssen").   Upon information and belief, J&J controls the sale and development of Janssen Pharmaceutical Inc.'s products and corresponds with the FDA regarding Janssen's products.

17.     Janssen manufactures, promotes, sells, and distributes, including the opioid Duragesic (fentanyl), in the United States and Oklahoma. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Janssen has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

18.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal

7

place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. PAR PHARMACEUTICAL INC. is headquartered in Chestnut Ridge, NY and an operating company of ENDO INTERNATIONAL PLC. (Endo Health Solutions Inc., Endo Pharmaceuticals Inc., and Par Pharmaceutical Inc. are referred to collectively as "Endo").

19.     Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States, including in Oklahoma. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, including in Oklahoma, by itself and through its subsidiaries and operating companies. Endo has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

20.     ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan plc in March 2015. Prior to that purchase, WATSON PHARMACEUTICALS, INC. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, and then Actavis plc in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

8

Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan plc exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. (Allergan plc, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to collectively as "Actavis").

21.     Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States, including in Oklahoma. Actavis has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

22.     MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its United States headquarters in St. Louis, Missouri. MALLINCKRODT, LLC, is a limited liability company organized and existing under the laws of the State of Delaware. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, plc. SPECGX LLC is a subsidiary of Mallinckrodt, plc based in St. Louis, Missouri. Mallinckrodt, plc, Mallinckrodt, LLC, and SpecGX LLC are collectively referred to as "Mallinckrodt."

23.     Mallinckrodt manufactures, markets, and sells drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the United States Department of Justice that it failed to detect and notify the United States Drug Enforcement Administration ("DEA") of suspicious orders of controlled substances. Mallinckrodt has registered with the Oklahoma Board of Pharmacy to do business in Oklahoma.

24.     MYLAN PHARMACEUTICALS, INC. ("Mylan") is headquartered in Canonsburg, Pennsylvania and is a subsidiary of Mylan N.V., a global pharmaceuticals company

registered in the Netherlands with its principal executive offices in Hatfield, Hertfordshire, United Kingdom. Mylan manufactures, markets and/or distributes more than 387 drugs in the United States.

25.     SANDOZ, INC. ("Sandoz") is a Colorado corporation registered to do business in Pennsylvania with its principal headquarters in Princeton, New Jersey. Sandoz is a wholly owned subsidiary of Novartis International AG, which is based in Basel, Switzerland. Sandoz manufactures, markets, and/or distributes pharmaceutical drugs throughout the United States.

26.     Sandoz manufactures, promotes, sells and distributes opioids such as fentanyl transdermal patch, methadone hydrochloride tablet, acetaminophen/hydrocodone bitrate tablet, acetaminophen/caffeine/dihydrocodeine bitrate tablet, acetaminophen/propoxyphene napsylate tablet, and oxycodone HCl USP tablet in the United States, including in Oklahoma.

27.     Collectively, Purdue, Cephalon, Janssen, Endo, Actavis, Mallinckrodt, Mylan, and Sandoz are the "Pharmaceutical Defendants".

## C.     Distributor Defendants

28.     CARDINAL HEALTH, INC. ("Cardinal") is a publicly traded company incorporated under the laws of Ohio with its principal place of business in Ohio.

29.     Cardinal distributes prescription opioids to providers and retailers, including in Oklahoma. Cardinal is registered to do business and receive service of process in Oklahoma. Cardinal is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

30.     AMERISOURCEBERGEN  CORPORATION  ("AmerisourceBergen")  is  a publicly traded company incorporated under the laws of Delaware with its principal place of business in Pennsylvania.

31.     AmerisourceBergen distributes prescription opioids to providers and retailers,

10

including in Oklahoma. AmerisourceBergen is registered to do business and receive service of process in Oklahoma.

32.    AmerisourceBergen is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

33.    MCKESSON CORPORATION ("McKesson") is a publicly traded company incorporated under the laws of Delaware with its principal place of business in San Francisco, California.

34.    McKesson distributes prescription opioids to providers and retailers, including in Oklahoma. McKesson is registered to do business and receive service of process in Oklahoma. McKesson is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

35.    WALGREENS BOOTS ALLIANCE, INC. also known as WALGREEN CO. ("Walgreens") is a Delaware corporation with is principal place of business in Illinois. At all relevant times, Walgreens has distributed and continues to distribute prescription opioids in Oklahoma, including in and around the Osage Nation's territories.

36.    MORRIS & DICKSON CO, LLC ("Morris") is a privately held company incorporated under the laws of Louisiana with its principal place of business in Louisiana.

37.    Morris distributes prescription opioids to providers and retailers, including in Oklahoma. Morris is registered to do business and receive service of process in Oklahoma. Morris is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

38.    WAL-MART INC., formerly known as Wal-Mart Stores, Inc. ("Wal-Mart") is a Delaware corporation with its principal place of business in Arkansas. At all relevant times, Wal-Mart has distributed and sold and continues to distribute and sell prescription opioids in Oklahoma,

including in and around the Osage Nation's territory.

39.     McQUEARY BROTHERS DRUG COMPANY, LLC ("McQueary Brothers") is a Delaware limited liability company with its principal place of business in California. In May 2008, McKesson Corporation acquired McQueary Brothers. At all times relevant, McQueary Brothers has distributed and continues to distribute prescription opioids in Oklahoma, including in and around the Osage Nation's territory.

40.     SAJ DISTRIBUTORS ("SAJ") is an Arkansas corporation, with its principal place of business in Arkansas. At all times relevant, SAJ has distributed and continues to distribute prescription opioids in Oklahoma, including in and around the Osage Nation's territory.

41.     Collectively, Cardinal, AmerisourceBergen, McKesson, Walgreens, M&D, Wal-Mart, McQueary, and SAJ are the "Distributor Defendants."

### III.     JURISDICTION AND VENUE

42.     This Court has jurisdiction over this action because Defendants conduct business in Osage County and throughout Oklahoma and have deliberately engaged in significant acts and omissions within Osage Nation's territories that have injured its tribal members. Defendants purposefully directed their activities at Osage Nation, including, but not limited to, marketing, distributing, or selling prescription opioids within Osage Nation's territories.

43.     Venue is proper in Osage County, State of Oklahoma.

44.     This action is non-removable because there is incomplete diversity of parties, no substantial federal question presented, and a claim for the abatement of a public nuisance within the Osage Nation's territories is based on state law.

### IV.     ADDITIONAL FACTUAL BACKGROUND

12

### A.   Defendants' Conduct Created A Devastating Opioid Epidemic in the Osage Nation

45.     Defendants make billions of dollars in profits through their deceptive and misleading opioid marketing campaign. The U.S. opioid market generates at least $10 billion per year in profits for opioid manufacturers like Defendants. For example, Purdue's sales of OxyContin alone have generated estimated sales of more than $35 billion since its release in 1996. While Defendants' unprecedented prescription opioid disinformation campaign yields drug manufacturers like Defendants billions of dollars in annual profits, the Osage Nation and its citizens are left bearing the enormous costs of the resulting public health crisis wreaking havoc in its communities.

46.     According to the Center for Disease Control and Prevention (the "CDC"), an increase in the availability and accessibility of opioids has contributed to the prescription drug abuse epidemic in the United States. As sales of prescription opioids have quadrupled since 1999, so have overdose deaths involving prescription opioids. From 1999 to 2015, more than 183,000 people died in the U.S. from overdoses related to prescription opioids. By 2010, enough prescription opioids were sold to medicate each and every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month. In 2014, almost 2 million Americans abused or were dependent on prescription opioids. According to the CDC, as many as 1 in 4 people prescribed opioids long term for non-cancer pain in primary care settings struggles with opioid addiction.

47.     Oklahoma has been hit particularly hard by Defendants' deceptive marketing of opioids. Oklahoma is one of the leading states in prescription painkiller sales per capita, with 128 painkiller prescriptions dispensed per 100 people in 2012. Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009. In 2012, Oklahoma

13

had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of these deaths.

48.     In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate.

49.     In 2015, 823 fatal drug overdoses occurred in Oklahoma, an almost 140% increase over 2001, with opioids contributing to the largest number of these deaths. As of 2015, there were more prescription drug overdose deaths each year in Oklahoma than overdose deaths from alcohol and all illegal drugs combined.

50.     According to 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed per adult resident with approximately 877 milligrams of opioids distributed per adult resident.

51.     A National Survey on Drug Use and Health revealed Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers.

52.     The impact on the Osage Nation within Oklahoma is even worse. As U.S. Surgeon General Vivek H. Murthy, MD stated when he met with Native Americans in Oklahoma to discuss opioid abuse in 2016: "The prescription opioid epidemic that is sweeping across the U.S. has hit Indian country particularly hard." The CDC reported in 2012 that 10% of Native Americans over the age of 12 used prescription pain medicine for nonprescription purposes, compared with 5% of whites and 1-in-30 African-Americans. In 2012, 13.3% percent of 12th grade Native American students reported prescription drug misuse in the past 30 days.

53.     As efforts are made to combat the prescription opioid epidemic, the Osage Nation citizens addicted to prescription opioids are now turning to illicit opioids such as heroin as a cheaper and more accessible alternative. According to the CDC, past misuse of prescription

opioids is the strongest risk factor for a person starting and using heroin. The death rate for heroin overdoses among Native Americans has risen 236% from 2010 to 2014.

54.     Defendants' conduct is affecting even the Osage Nation's youngest and most vulnerable citizens. The national rate of babies born with neonatal abstinence syndrome ("NAS"), a group of conditions newborns experience when withdrawing from exposure to drugs like opioids, increased fivefold from 2000 to 2012. In just one year spanning from 2013 to 2014, the number of newborns testing positive for prescription medications doubled. In Indian Country, the statistics are worse. American Indian women are 8.7 times more likely to be diagnosed with maternal opiate dependency or abuse during pregnancy compared to non-Hispanic whites. Babies born with NAS require lengthy hospital stays and other medical treatment and thus, dramatically increase health care costs for the Osage Nation and its citizens.

**B.     Defendants Falsely and Deceptively Marketed Their Opioids to the Osage Nation**

55.     Defendants caused catastrophic damage to the Osage Nation by dramatically altering the perception of opioids by doctors and patients alike. Prior to Defendants' deceptive marketing campaign, the medical community and consumers primarily relied on opioids for limited purposes, such as surgery recovery, cancer treatment, and end-of-life palliative care. This was largely due to the risk of addiction and abuse posed by these powerful drugs. Defendants sought to change that perception in two key ways. First, Defendants misrepresented the risks of addiction and abuse from opioids. Defendants falsely represented that the risks of addiction were overstated and that scientific studies supported a low risk of addiction associated with their drugs. Second, Defendants touted unsubstantiated benefits of opioid treatment, including its effectiveness in treating chronic non-cancer related pain.

56.     Each Defendant employed massive and unprecedented marketing campaigns

15

premised on these two key misrepresentations. Defendants repeated these misrepresentations to physicians and consumers throughout the country, including directly to physicians and consumers in and around the Osage Nation. At times, Defendants specifically targeted vulnerable patient populations. Defendants, often working together, ensured a uniform nationwide marketing strategy through, for example, trained and monitored sales representatives, centralized speaker training and prescribed talking points, and funding and oversight of seemingly third-party individuals and entities supporting Defendants' desired message.

57.     Defendant's efforts have been extremely successful. Opioids are now the most prescribed class of drugs. The success of Defendants deceptive marketing has been a financial windfall for opioid manufacturers. Sales in the U.S. alone have exceeded $8 billion in revenue annually since 2009. It has also caused the worse health epidemic in American history. In an open letter to the nation's physicians in 2016, the then-U.S. Surgeon General acknowledged the connection:

> Nearly two decades ago, we were encouraged to be more aggressive about treating pain, often without enough training and support to do so safely. This coincided with heavy marketing of opioids to doctors. Many of us were even taught, incorrectly, that opioids are not addictive when prescribed for legitimate pain.

58.     Defendants utilized several mediums to distribute the false representations regarding their opioids - including both direct marketing and indirect marketing through clandestine channels. Defendants targeted this deceptive marketing to both prescribers and consumers of opioids to change their perceptions of these drugs.

59.     Defendants spent millions on false and deceptive branded marketing that minimized the risk of addiction and exaggerated the efficacy of opioid therapy for chronic non-cancer pain in medical journal advertisements, patient brochures, promotional videos, sponsored links on internet search engines and other marketing materials. For example, Defendants

mispresented the risk of addiction in its marketing materials by citing "studies" like the "Porter-Jick Letter." However, this "study" was actually a 101-word, single-paragraph letter to the editor in a medical journal from 1980, which focused exclusively on hospitalized patients who were given narcotics in a hospital setting. It did not establish or support the misrepresentation for which Defendants used it (i.e. that addiction is rare from opioid treatment of pain). Defendant Purdue even sponsored a study that made the claim that "the risk of psychological dependence or addiction is low in the absence of a history of substance abuse." The sole support for this statement was the "Porter-Jick Letter." And a co-author of the study was an employee of Defendant Purdue.

60.    A June 2017 study published in the New England Journal of Medicine noted a sizeable increase in citation to the Porter-Jick Letter after the introduction of OxyContin and that nearly three quarters of the articles referencing the letter cited it "as evidence that addiction was rare in patients treated with opioids." This study reached the conclusions that the letter was "heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy." Dr. Jick later explained that his Letter was misused by drug companies "pushing out new pain drugs" to falsely conclude that their opioids were not addictive "[b]ut that's not in any shape or form what we suggested in our letter."

61.    Defendants also trained large sales forces to repeat their false messaging on the low risk of addiction and efficacy of opioids for chronic non-cancer pain directly to health care professionals through office visits, including to Oklahoma medical professionals. For example, according to an interview by a former Purdue sales manager from 2003, Defendant Purdue trained its sales representatives for OxyContin "to say things like it is 'virtually' non-addicting . . . . That's what we were instructed to do. It's not right, but that's what they told us to say." This same manager claimed he was trained that OxyContin was "non-habit forming."

62.    Defendants' sales representatives marketed their opioids directly to unsuspecting

17

physicians in and around the Osage Nation. According to ProPublica's "Dollars for Doctors" investigation, Defendants' sales representatives have frequently visited and preyed upon Oklahoma primary care physicians and specialists and offered them tens of thousands of dollars per year in food and beverage fees, promotional speaking fees, consulting fees and travel and lodging fees. For example, in 2015 alone, Defendant Purdue visited one Oklahoma high-opioid prescribing physician 22 times related to its opioids and paid for food and beverage during each of these visits. Defendant Purdue also paid another frequent Oklahoma opioid prescriber over $57,000 in promotional speaking, consulting, travel and lodging, and food and beverage fees related to its opioids between August 2013 and December 2015. Defendant Cephalon also paid this same prescriber thousands of dollars in promotional speaking fees. Defendant Janssen also visited Oklahoma prescribers for purposes of marketing their opioids and paid for food and beverage during these visits and many others. It was during these visits and others that Defendants directly misled Oklahoma physicians regarding the addictiveness and effectiveness of opioids.

63.    A 2016 study found that providing industry-sponsored meals to physicians was associated with an increased rate of prescribing the brand-named medication being promoted. The study found that physicians receiving meals related to the target drugs on four or more days prescribed the drugs from 1.8 times to as much as 4.5 times the rate of physicians receiving no meals. The study found that even a "single industry-sponsored meal with a mean value of less than $20 was associated with prescription of the promoted brand-name drug at significantly higher rates" and that additional and more costly meals were associated with greater increases in prescribing.

64.    Other examples of Defendants' direct marketing efforts include:

a. Defendant Purdue distributed a series of advertisements known as "pain vignettes" which included purported case studies of patients with chronic pain conditions and recommending OxyContin for each. One vignette, for

18

example, described a "54-year old writer with osteoarthritis of the hands" and implied that OxyContin would help him work more effectively.

b. Defendant Purdue distributed a promotional video stating, among other things: "There's no question that our best, strongest pain medicines are the opioids . . . In fact, the rate of addiction amongst pain patients who are treated by doctors is much less than 1%. They don't wear out, they go on working. They do not have serious medical side effects...These drugs which I repeat are our best, strongest pain medications should be used much more than they are for patients in pain."

c. According to an interview with a former Purdue sales manager from 2003, Defendant Purdue trained its sales representatives for OxyContin "to say things like it is 'virtually' non-addicting . . . That's what we were instructed to do. It's not right, but that's what they told us to say." This same manager claimed he was trained that OxyContin was "non-habit forming."

d. Defendant Purdue misrepresented OxyContin in medical journal advertisements as, among other things, having been studied for all kinds of arthritis, promoting its use among the elderly without providing accompanying risk information, and omitting information about abuse and addiction potential.

e. Defendant Purdue represented OxyContin was less addictive and safer than other brands of oxycodone.

f. Defendant Actavis distributed written product advertisements that minimized and/or omitted the serious risks associated with Kadian and also misrepresented its benefits by making unsupported representations, including that it would "[a]llow patients to live with less pain and get adequate rest with less medication" and implying it would relieve stress caused by pain and help patients enjoy their lives.

g. Defendant Actavis's predecessor distributed a patient education brochure to be distributed in 2007 for Kadian that claimed addiction is "less likely if you have never had an addiction problem."

h. Defendant Actavis trained its sales representatives with documents claiming that "most chronic benign pain patients do have markedly improved ability to function when maintained on chronic opioid therapy," long-acting opioids were less likely to produce addiction than short-acting opioids; and certain behaviors, generally associated with addiction, actually constituted "pseudoaddiction."

i. Defendant Janssen made unsubstantiated representations that Nucynta was appropriate for broader pain conditions than indicated and downplayed its risks.

j. Defendant Cephalon, through its sales force and other marketing, misrepresented Actiq and Fentora as being appropriate for non-cancer pain and non-opioid-tolerant individuals, despite their labels' contrary warnings.

k. Defendant Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker, chef, and teacher, misleadingly implying that the drug would provide long-term pain relief and functional improvement.

65. Through their branded marketing campaign, Defendants falsely represented and/or omitted the risks of addiction and falsely touted the benefits of their opioids.

**i.   Defendants Falsely Marketed Their Opioids to the Osage Nation Through Other Clandestine Channels including Members of the Medical Community and Seeming Third-Party Front Groups**

66. In addition to branded marketing, much of Defendants' false and deceptive marketing was *unbranded* marketing through seemingly unbiased medical professionals called Key Opinion Leaders ("KOL") and third-party advocacy front groups, which Defendants funded and influenced. Often working in concert with each other, KOLs and/or front groups, Defendants influenced the content of the vast majority of professional resources on the use of opioids to treat chronic non-cancer pain to minimizing the perceived risk of opioid abuse and addiction and overstating the benefits.

67. Defendants paid KOLs to give speeches, make media appearances, present continuing medical education ("CME") courses, author books and articles, conduct studies and perform other work to convince physicians they could aggressively prescribe opioids to treat patients with chronic non-cancer pain without consequence. While acting as paid consultants, advisors and speakers for Defendants, the KOLs held leadership positions in front groups funded and influenced by Defendants and served on committees that drafted treatment guidelines

encouraging doctors to liberally prescribe opioids to treat chronic non-cancer pain.

68.     For example, Defendants utilized KOL Dr. Portenoy, the former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, to promote opioid use for the treatment of chronic non-cancer pain and minimize the risk of abuse and addiction. Dr. Portenoy received honoraria, research support and/or consulting fees from Defendants Cephalon, Purdue, Endo and Janssen and other opioid manufacturers, and was a paid consultant to Defendants Cephalon and Purdue. Simultaneously, Dr. Portenoy served on the board of directors of the American Pain Foundation ("APF"), a front group that in 2010 received 90% of its funding from the drug and medical device industry, including Defendants Cephalon, Janssen and Purdue. Dr. Portenoy also was a past president of the American Pain Society ("APS"), a known front group that received substantial funding from Defendant Purdue and that aggressively lobbied to make pain "the 5th vital sign." Dr. Portenoy served on the committee that drafted clinical guidelines issued by APS and the American Association of Pain Medicine ("AAPM"), a front group that zealously advocated for using opioids to treat chronic non-cancer pain, touting opioids as "essential" for the treatment of chronic non-cancer pain.

69.     In media appearances, Dr. Portenoy often parroted Defendants' false claim that less than 1% of opioid users become addicted. For example, in 2010, Dr. Portenoy said the following on Good Morning America:

> Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted.

70.     Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that less than 1% of patients

would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[1] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[2] In an interview, Dr. Portenoy also admitted Defendants role in skewing the message regarding the addictiveness of opioids:

> When the pharmaceutical industry began to perceive that there was huge profit by expanding the use of opioids for chronic non-cancer pain, and the educational messaging went out there as if chronic non-cancer pain and chronic cancer pain should be taught in the same way, without any reference to balance, without any reference to the risk of abuse and addiction. *Then that skewing of the message undoubtedly promoted inappropriate prescribing and has led to negative outcomes.*

71.    Defendants also utilized KOL Dr. Lynn Webster, the former Chief Medical Director of Lifetree Clinical Research, a pain clinic in Utah, to spread misrepresentations regarding opioid use through CMEs, speeches, books and other materials. Dr. Webster was a consultant, member of the advisory board and/or received honoraria from Defendants Purdue, Janssen, Endo and Cephalon, among other drug manufacturers. Dr. Webster also was a former president and board member of the AAPM. Dr. Webster authored CMEs funded by Defendants Cephalon and Purdue and frequently served as an expert witness or consultant on cases on behalf of doctors charged with improper prescribing of opioids. While acting as a KOL, Dr. Webster's pain clinic was raided by the DEA as part of its investigation of overprescribing opioids. Although the DEA

---

[1] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.
[2] *Id.*

22

closed the investigation without charges, 20 of Dr. Webster's former patients died of opioid overdoses.

72.     Ironically, Dr. Webster created and promoted the Opioid Risk Tool, a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and, for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen and Purdue. Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Pharmaceutical Defendants and those under their influence and control.

73.     Dr. Webster also co-authored *Avoiding Opioid Abuse While Managing Pain*, a 2007 guide for practitioners that promoted the use of opioids for the treatment of chronic non-cancer pain and repeatedly minimized the risk of opioid addiction. In this book, Dr. Webster states, "research clearly indicates that most patients treated with prescribed opioids for acute or chronic pain will not become addicted to their medication" and "[t]rue opiate addiction that results from long-term opioid therapy is relatively rare."[3]

74.     Upon information and belief, Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[4]

---

[3] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).
[4] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012, http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html.

75.     In 2011, Dr. Webster also presented a webinar program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of risk screening tools, urine testing and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors in Oklahoma and doctors treating Osage Nation citizens.[5]

76.     Dr. Webster also was a proponent of the concept of "pseudoaddiction," which Defendants used to convince prescribers that classic signs of addiction should actually be treated with even *more* opioids because they were signs the patient was experiencing undertreated pain. In defining "pseudoaddiction," Dr. Webster claimed:

> A patient may suffer from pain that is not controlled by prescribed medication. . . . The patient then escalates the dose or otherwise defies medical orders in an attempt to curb the pain. The resulting drug-seeking behavior may look like addiction, but it is not. If the patient had not experienced pain or required treatment with opioids, a substance-abuse problem would not have developed. The patient may seek prescriptions from more than 1 provider or may repeatedly visit a hospital emergency department. He or she may even alter a prescription to obtain more medication.

77.     Dr. Webster recommends that if patients present this type of aberrant, abuse-indicative behavior, then "in most cases *increasing the dose* should be the clinician's first response."

78.     Like Dr. Portenoy, Dr. Webster has since acknowledged certain statements he made were false and unsupported. For example, Dr. Webster acknowledged that the concept of "pseudoaddiction" that he repeatedly promoted *had no basis in fact*, admitting: "[T]he concept of

---

[5] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk*, http://www.emergingsolutionsinpain.com/ce-education/opioid-management?option=com_continued&view=frontmatter&Itemid=303&course=209 (last visited Aug. 22, 2017).

pseudoaddiction obviously became too much of an excuse to give patients more medication. . . . It led us down a path that caused harm. It is already something we are debunking as a concept."

79.     In addition to KOLs, Defendants also funded and collaborated with front groups to produce and disseminate treatment guidelines, patient education guides, books, CME courses, articles and other materials and establish pain treatment advocacy websites, that promoted chronic opioid treatment, minimized the risk of opioid abuse and addiction, and overstated the benefits of opioids to treat chronic non-cancer pain. [6]

80.     For example, the APF was one of the more prominent "pain advocacy" organizations Defendants utilized to spread their misrepresentations. Although APF described itself as an independent nonprofit organization and "the largest advocacy organization for people with pain," it was funded nearly entirely by the drug and medical device industry.   In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of a total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, upon information and belief, APF was entirely dependent on incoming grants from Pharmaceutical Defendants Purdue, Cephalon, Endo and others to avoid using its line of credit.

81.     Some of APF's board members were well-known KOLs with extensive financial ties to Defendants and other opioid manufacturers, including Dr. Portenoy and Dr. Perry Fine.

---

[6] See generally, e.g., Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015), https://www.finance.senate.gov/imo/media/doc/050517%20Senator%20Wyden%20to%20Secretary%20Price%20r e%20FDA%20Opioid%20Prescriber%20Working%20Group.pdf.

While a member of APF's board of directors, KOL Dr. Fine was the lead author of a study sponsored by Defendant Cephalon that found its opioid Fentora was "generally safe and well-tolerated" in non-cancer patients even though it is only indicated for severe cancer pain. Dr. Fine also acted as a consultant and speaker and received research support from Defendant Purdue, acted as a consultant and served on the advisory board of Defendant Cephalon, acted as a consultant and speaker and provided educational services to Defendant Janssen, and served on the advisory board and received honoraria for serving on the advisory board of Defendant Actavis. Dr. Fine also was a former President of the front group AAPM. AAPM's current President, Dr. Steven P. Stanos, is another KOL with known financial ties to Defendants Purdue and Janssen. Dr. Stanos was the activity chairperson for an October 2011 CME that promoted the concept of "pseudoaddiction" to health care providers. At the time, Dr. Stanos served on both the speakers' bureaus and as a consultant or advisory board member of Purdue and Janssen.

82.     APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing and thus the profitability of its sponsors. Upon information and belief, APF was often called upon to provide "patient representatives" for the Pharmaceutical Defendants' promotional activities, including for Purdue's "Partners Against Pain" and Janssen's "Let's Talk Pain." APF functioned largely as an advocate for the interests of the Pharmaceutical Defendants, not patients. Indeed, upon information and belief, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

83.     Plaintiff is informed, and believes, that Pharmaceutical Defendants often suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund

these activities and publications, knowing that drug companies would support those projects. APF issued pain treatment guides sponsored in part by Defendants Purdue and Cephalon for patients, journalists, and policymakers. Many of the expert advisors that developed the guidelines were KOLs with significant financial ties to Defendants, including Dr. Portenoy. These guides were riddled with the same lies. For example, APF's pain treatment guide for reporters stated, "[m]any people living with pain and even some healthcare providers falsely believe opioids [] are universally addictive" yet "[s]tudies have shown that the risk of addiction is small when these medicines are properly prescribed and taken as directed." APF's guide for patients claims, "[d]espite the great benefit of opioids, they are often under-used," because "providers may be afraid to give them, and the public may be afraid to take them," suggesting that a fear of prescribing opioids or consuming opioids is unjustified. APF's guide for policymakers sponsored by Defendant Purdue similarly claimed, "[u]nless a person with pain has a past or current personal or family history of substance abuse, the likelihood of addiction is low when opioids are appropriately prescribed, taken as directed and monitored by a responsible and knowledgeable healthcare provider." The guide also promotes the deceptive concept of "pseudoaddiction." All of the programs and materials published by APF were available nationally and were intended to reach Osage Nation's citizens.

84.     APF also lobbied vigorously against federal and state proposals to limit opioid use. For example, in 2009, the APF lobbied against the FDA's recommendation for physician and pharmacist certifications to ensure they had been educated about the risks of long-acting opioids. And, APF filed *amicus curiae* briefs in support of opioid manufacturers and overprescribing doctors in state and federal courts. For example, APF filed an *amicus* brief in support of a Virginia doctor accused of prescribing one patient 1,600 Roxicodone pain pills in one day and more than

27

500,000 pills to that patient over a three-year period, claiming the conviction would "deter physicians from treating chronic pain by prescribing opioid medications." In its brief, APF relied on a text authored by KOL Dr. Portenoy to claim, "[e]xperience shows that patients rarely become addicted to prescribed opioids" and "respiratory depression, even extremely high levels, does not occur in the context of appropriate clinical treatment." [7]

85.     The U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Pharmaceutical Defendants stopped funding it. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately." [8]

86.     Another front group for the Pharmaceutical Defendants was AAPM. With the assistance and funding of the Pharmaceutical Defendants, AAPM issued purported treatment guidelines hosted medical education programs essential to the Pharmaceutical Defendants' deceptive marketing of chronic opioid therapy.

87.     AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event, its annual meeting held in Palm Springs, California. AAPM describes the annual event as an "exclusive venue" for offering

---

[7] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005) [hereinafter Brief of APF] at 9.
[8] Charles Ornstein & Tracy Weber, Senate Panel Investigates Drug Companies' Ties to Pain Groups, Wash. Post, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html.

education programs to doctors. Pharmaceutical Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.

88.     Upon information and belief, AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine and Lynn Webster. Dr. Webster was even elected president of AAPM while under DEA investigation. The Pharmaceutical Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

89.     In 1997 and 2001, the APS and AAPM issued consensus statements that endorsed the use of opioids to treat chronic non-cancer pain and minimized the risk of addiction. The 1997 Consensus statement claimed "[s]tudies indicate that the de novo development of addiction when opioids are used for relief of pain is low." The co-author of the consensus statement, Dr. J. David Haddox, was a member of Defendant Purdue's speaker bureau and later Purdue's Vice President of Health Policy. The 2001 consensus statement similarly claimed, "[m]ost specialists in pain medicine and addiction medicine agree that patients treated with prolonged opioid therapy . . . do not usually develop addictive disorders." It also promoted the concept of "pseudoaddiction" claiming "[a]n individual's behaviors that may suggest addiction sometimes are simply a reflection of unrelieved pain or other problems unrelated to addiction." The consensus statement remained

29

on AAPM's website until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.[9]

90.    In 2009, the APS and AAPM issued opioid treatment clinical guidelines that recommended primary care and specialty care health care providers use opioids to treat chronic pain. Six of the 21 panelists involved in drafting the guidelines received financial support from Defendant Purdue and another eight received support from other opioid manufacturers including Defendants Janssen, Endo, and Cephalon. These included well-known KOLs with extensive financial ties to Defendants, including Dr. Portenoy and Dr. Fine. The APS/AAPM guidelines recommended opioids as "safe and effective" for the treatment of chronic non-cancer pain based on "low quality evidence." The guidelines also minimized the risk of opioid addiction, claiming the risk is manageable even for those with a prior history of substance abuse.[10]   Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits.

91.    At least 14 of the 21 panel members who drafted the AAPM/APS guidelines, received support from Pharmaceutical Defendants Janssen, Cephalon, Endo, and Purdue. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Pharmaceutical Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on

---

[9] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).
[10] *Id.*

opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in and around the Osage Nation's territories during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*. The Pharmaceutical Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Pharmaceutical Defendants financial support to members of the panel.

92.     While headed by Dr. Portenoy, the APS began aggressively promoting the concept of "Pain as the 5th Vital Sign," encouraging health care practitioners to assess, monitor and treat pain as they would pulse, blood pressure, temperature and respiratory rate. Soon after, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") and the Federation of State Medical Boards ("FSMB"), bought into the concept. In 2001, JCAHO, a non-profit organization that accredits and certifies thousands of healthcare organizations nationwide, created new pain management standards that required pain to be assessed in all patients. During 2001 and 2002, Defendant Purdue funded a series of nine programs throughout the country to educate hospital physicians and staff on how to comply with the JCAHO pain standards and to discuss postoperative pain treatment. Under an agreement with JCAHO, Defendant Purdue was allowed to exclusively distribute certain educational videos and a book about pain management that were also available for purchase from JCAHO's website. A book printed by JCAHO and sponsored by Defendant Purdue cited studies claiming, "there is no evidence that addiction is a significant issue when persons are given opioids for pain control" and called doctors' concerns about the risks of opioid addiction "inaccurate" and "exaggerated." A 2003 GAO report suggested "Purdue's participation in these activities with JCAHO may have facilitated its access to hospitals to promote OxyContin." Dr. David W. Baker, JCAHO's executive vice president for health care quality has since stated: "There is no doubt that the widely held belief that short-term use of opioids had low risk of addiction was an important contributor to inappropriate prescribing patterns for opioids and the

subsequent opioid epidemic." He acknowledged that "[t]he Joint Commission was one of the dozens of individual authors and organizations that developed educational materials for pain management that propagated this erroneous information."

93. FSMB, an opioid manufacturer-financed trade group representing 70 state medical and osteopathic regulatory boards, with financial support from opioid manufacturers and front groups, developed written model guidelines to encourage federal and state regulatory agencies to adopt policies promoting the use of opioids for the treatment of chronic non-cancer pain. The contributors to the 1998 Model Guidelines were front groups APS, AAPM and the University of Wisconsin Pain & Policies Study Group, all of which had extensive financial relationships with pharmaceutical companies, including Defendants. Between 1999 and 2010, Defendant Purdue paid the UW Pain & Policies Study Group approximately $2.5 million. From 1997 through 2012, FSMB received $2 million from opioid manufacturers including Defendants Purdue, Endo, and Cephalon.

94. The Model Guidelines described opioids as "essential" to the treatment of chronic pain, including chronic non-cancer pain. The Model Guidelines also downplayed the risk of addiction, stating, "[p]hysicians should recognize that tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not synonymous with addiction." The Guidelines even recommended prescribing opioids to patients at high risk for substance abuse or with a history of substance abuse. They also failed to mention the severe risks of opioids including respiratory depression and overdose. Instead, the Guidelines downplayed addiction claiming, "inadequate understandings of addiction" lead to "inadequate pain control" and promoted the misleading concept of "pseudoaddiction," defining it as a "[p]attern of drug- seeking behavior of pain patients who are receiving inadequate pain treatment that can be mistaken for addiction." The Model Guidelines were "widely distributed to state medical boards, medical

professional organizations, other health regulatory boards, patient advocacy groups, pharmaceutical companies, state and federal regulatory and practicing physicians and health care providers."

95.     In 2003, the FSMB revised its Model Guidelines and adopted them in 2004 as its Model Policy. The Model Policy continued to encourage the liberal prescription of opioids for chronic non-cancer pain, repeating the claim from the Model Guidelines that opioids are "essential" to the treatment of chronic non-cancer pain. The Model Policy continued promoting the concept of "pseudoaddiction," describing drug-seeking behaviors as a "misinterpretation of relief seeking behaviors" rather than signs of addiction. The Model Policy even threatens that under treatment of pain is "a departure from standards of practice," and suggests physicians would be sanctioned by state medical boards for not prescribing opioids to treat chronic non-cancer pain. At least 38 state medical boards, including the Oklahoma State Board of Medical Licensure and Supervision, adopted the Model Guidelines or Model Policy in full or in part.

96.     FSMB, along with drug manufacturers, including Defendants Cephalon and well-known front groups, APF and AAPM, sponsored a book, *Responsible Opioid Prescribing: A Physician's Guide.* This book translated FSMB's Model Policy to practitioners nationwide, including physicians in and around the Osage Nation. At the time, the author, Dr. Scott Fishman, had financial ties to Defendants Cephalon, Janssen, Endo, and Purdue, among other drug manufacturers. Dr. Fishman disclosed being on the speaker's bureau and receiving grants/research support from Defendants Endo, Janssen, and Purdue, and a consultant to Defendant Cephalon. Dr. Fishman also served as Vice Chairman of APF's board of directors, past president of AAPM's and on APS's board of directors. Despite these close financial ties to drug manufactures, the text presents Dr. Fishman as an unbiased "Past President of the American Academy of Pain Medicine" and calls him a "true thought leader in academic medicine, clinical practice, and public health

33

policy."

97.     In Responsible Opioid Prescribing, Dr. Fishman repeated many of the same lies from the Model Guidelines and Model Policy including touting opioids as "essential" to treat non-chronic cancer pain. Dr. Fishman made the unsubstantiated claim that opioid therapy to relieve pain and improve function is "widely accepted" as "a legitimate medical practice" for acute and chronic non-cancer pain to relieve pain and improve function." Dr. Fishman claimed opioids are "often underutilized" and pain is "undertreated" because of the "confusion about the risks associated with the use of these drugs, particularly about addiction." He even employed the scare tactics of the FSMB Model Policy suggesting that physicians who do not treat pain may risk being sued or sanctioned by their medical boards, claiming, "not treating pain is often not a 'safe' option." Dr. Fishman also promotes the deceptive concept of "pseudoaddiction." Dr. Fishman even concludes that signs such as "[r]equesting analgesics by name, [d]emanding or manipulative behavior, [c]lock watching, [t]aking opioids for an extended period, [o]btaining opioid drugs from more than one physician, and [h]oarding opioids" are not indicative of addiction but rather "pseudoaddiction" and actually require more opioids to be prescribed. From its release in 2007 through January 2012, Responsible Opioid Prescribing was distributed to physicians in all 50 states and the District of Columbia. Between 2008 and 2011, Responsible Opioid Prescribing generated approximately $36,437.00 in book sales revenue from Oklahoma and, approximately 6,000 copies were distributed in the State.

98.     The Pharmaceutical Defendants worked together through these front groups to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various front groups, almost all of which received

34

substantial funding from the Pharmaceutical Defendants. Among other projects, PCF worked to ensure that a FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Pharmaceutical Defendants determined would reduce prescribing.

99.     Through these KOLs, front groups and others, Defendants preyed on the most vulnerable, including children, veterans and the elderly. APF's guide for policymakers sponsored by Defendant Purdue falsely represented that "less than 1% of children treated with opioids become addicted." This is a particularly egregious claim given that opioid medication use is of great concern with respect to the child population according to the 2016 CDC Guideline for Prescribing Opioids for Chronic Pain ("CDC Guidelines"). .

100.    In 2009, APF specifically targeted veterans. For example, its publication, *Exit Wounds* (aimed at pain treatment for veterans), describes opioids as "unsurpassed" for their "pain-relieving properties" and the "'gold standard' of pain medications" that "despite their great benefits, [] are often underused." *Exit Wounds* makes numerous misrepresentations, claiming for example that "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."

101.    Defendants, in collaboration with front groups, also aggressively promoted opioid prescribing to the elderly. In 2009, the American Geriatrics Society ("AGS") published guidelines that state, "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." However, the cited study did not even evaluate addiction risk by age group. Based on "low quality evidence," the AGS guidelines made the "strong recommendation" that "[a]ll patients with moderate to severe pain, pain-related functional impairment, or diminished quality of life due to pain should be considered for opioid therapy[.]"

Drug manufacturers including Defendant Purdue provided grants to AGS for distribution of these guidelines. KOL Dr. Fine, was on the AGS Panel that created the guidelines, and front group AAPM peer reviewed a draft of the guidelines. AGS and AAPM also distributed guidelines sponsored by Defendant Janssen that contained several purported "facts" that were unsupported and/or misleading, including the "[f]act" that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

102.    Importantly, the majority of the material described above was unbranded, meaning that Defendants' and their products' names often did not appear on these materials, obscuring the funding source of the materials and creating a perception that such material was independently created. Such unbranded marketing efforts were part of Defendants' conspiracy to increase opioid prescribing and sales – that is, to create a market for opioids where no market had previously existed.

### iii.    Defendants issued false instructions and guidelines with respect to use of their opioid products.

103.    In addition to misstating the addiction risk and inventing the pseudoaddiction falsehood, the Pharmaceutical Defendants engaged in a third category of false, deceptive, and unfair practices:. The Pharmaceutical Defendants' issued false instructions that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Pharmaceutical Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Pharmaceutical Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

36

a.   Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speaker's bureau in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

b.   Purdue, upon information and belief, sponsored a 2011 webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c.   As recently as 2015, upon information and belief, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

d.   On information and belief, detailers for the Pharmaceutical Defendants have touted and continue to tout to doctors in Oklahoma the reliability and effectiveness of screening or monitoring patients as a tool for managing opioid abuse and addiction.

104.   Once again, the 2016 CDC Guideline confirms that these statements were false, misleading, and unsupported at the time they were made by the Pharmaceutical Defendants. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

105.   In fact, the CDC Guidelines make clear, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least

37

1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.[11]

106.    To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, the Pharmaceutical Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem and failed to disclose the increased difficulty of stopping opioids after long-term use.

107.    For example, upon information and belief, a 2011 non-credit educational program sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

108.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur."[12]

109.    The Pharmaceutical Defendants deceptively minimized the significant symptoms of opioid withdrawal – which, as explained in the 2016 CDC Guideline, include drug craving, anxiety, insomnia, abdominal pain, vomiting, diarrhea, tremor, and tachycardia (rapid heartbeat) – and grossly understated the difficulty of tapering, particularly after long-term opioid use.

110.    Contrary to the Pharmaceutical Defendants' representations, the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal

---

[11] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Barto, Vice President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 5.
[12] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers- guide.pdf.

symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "more than a few days of exposure to opioids significantly increases hazards" and "each day of unnecessary opioid use increases likelihood of physical dependence without adding benefit."

111.    The Pharmaceutical Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to the Pharmaceutical Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. Some illustrative examples of these deceptive claims are described below:

    a.    On information and belief, Actavis' predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction."

    b.    Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available online.[13]

    c.    Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

    d.    Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really

---

[13] Am. Pain Found., *Treatment Options: A Guide for People Living in Pain* (2007) [hereinafter APF, *Treatment Options*],   https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

need it?" The response is, "The dose can be increased. . . .You won't 'run out' of pain relief."[14]

e. Janssen, on information and belief, sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages. In contrast, the guide states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

f. Janssen sponsored and funded a multimedia patient education campaign called "Let's Talk Pain." One feature of the campaign was to complain that patients were under-treated. In 2009, upon information and belief, a Janssen-sponsored website, part of the "Let's Talk Pain" campaign, featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

g. Upon information and belief, Purdue's *In the Face of Pain* website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

h. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages. The publication was originally published in 2011 and is still available online.

i. In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit and available until at least 2012. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

j. Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the front group APF and others

---

[14] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

argued to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.

k. Upon information and belief, Purdue's detailers have told doctors in Oklahoma that they should increase the dose of OxyContin, rather than the frequency of use, to address early failure.

112.    These claims conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC also states that there are "increased risks for opioid use disorder, respiratory depression, and death at higher dosages."

113.    The Pharmaceutical Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can prevent and curb addiction and abuse.

114.    These abuse-deterrent formulations (AD opioids) purportedly are harder to crush, chew, or grind; become gelatinous when combined with a liquid, making them harder to inject; or contain a counteragent such as naloxone that is activated if the tablets are tampered. Despite this, AD opioids can be defeated – often quickly and easily – by those determined to do so. The 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies – even when they work – do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes. Moreover, they do not reduce the rate of misuse and abuse by patients who become addicted after using opioids long-term as prescribed or who escalate their use by taking more pills or higher doses. Tom Frieden, the Director of the CDC, has

41

further reported that his staff could not find "any evidence showing the updated opioids [ADFs] actually reduce rates of addiction, overdoses, or death."[15]

115.   Despite this lack of evidence, the Pharmaceutical Defendants have made and continue to make misleading claims about the ability of their so-called abuse deterrent opioid formulations to prevent or reduce abuse and addiction and the safety of these formulations.

116.   For example, Endo has marketed Opana ER[16] as tamper or crush resistant and less prone to misuse and abuse even though: (1) on information and belief, the FDA warned in a 2013 letter that there was no evidence that Opana ER would provide a reduction in oral, intranasal or intravenous abuse; and (2) Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed. Nonetheless, Endo's advertisements for Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. And upon information and belief, detailers for Endo have informed doctors that Opana ER is harder to abuse.

117.   Likewise, Purdue has engaged and continues to engage in deceptive marketing of its AD opioids – i.e., reformulated OxyContin and Hysingla. Before April 2013, Purdue did not market its opioids based on their abuse deterrent properties. However, beginning in 2013 and continuing today, detailers from Purdue regularly use the so-called abuse deterrent properties of Purdue's opioid products as a primary selling point to differentiate those products from their competitors. Specifically, upon information and belief, these detailers: (1) falsely claim that Purdue's AD

---

[15] Matthew Perrone et al., *Drugmakers push profitable, but unproven, opioid solution*, Center for Public Integrity (Dec. 15, 2016), available at https://www.publicintegrity.org/2016/12/15/20544/drugmakers-push-profitable-unproven-opioid-solution.

[16] Because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and a serious blood disease, in May 2017, a FDA advisory committee recommended that Opana ER be withdrawn from the market. The FDA adopted this recommendation on June 8, 2017 and requested that Endo withdraw Opana ER from the market. Press Release, "FDA requests removal of Opana ER for risks related to abuse," June 8, 2017, available at https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

opioids prevent tampering and cannot be crushed or snorted; (2) falsely claim that Purdue's AD opioids prevent or reduce opioid misuse, abuse, and diversion, are less likely to yield a euphoric high, and are disfavored by opioid abusers; (3) falsely claim Purdue's AD opioids are "safer" than other opioids; and (4) fail to disclose that Purdue's AD opioids do not impact oral abuse or misuse and that its abuse deterrent properties can be defeated.

118.   These statements and omissions by Purdue are false and misleading. Purdue knew and should have known that reformulated OxyContin is not better at tamper resistance than the original OxyContin and is still regularly tampered with and abused. A 2015 study also shows that many opioid addicts are abusing Purdue's AD opioids through oral intake or by defeating the abuse deterrent mechanism. Indeed, one-third of the patients in the study defeated the abuse deterrent mechanism and were able to continue inhaling or injecting the drug. And to the extent that the abuse of Purdue's AD opioids was reduced, those addicts simply shifted to other drugs such as heroin.[17] Despite this, Purdue's J. David Haddox falsely claimed in 2016 that the evidence does not show that Purdue's AD opioids are being abused in large numbers.[18]

119.   The development, marketing, and sale of AD opioids are a continuation of the Pharmaceutical Defendants' strategy to use misinformation to drive profit. The Pharmaceutical Defendants' claims that AD opioids are safe falsely assuage doctors' concerns about the toll caused by the explosion in opioid abuse, causing doctors to prescribe more AD opioids, which are far more expensive than other opioid products even though they provide little or no additional benefit.

**C.     Defendants Representations Were False and Misleading**

---

[17] Cicero, Theodore J., and Matthew S. Ellis, "Abuse-deterrent formulations and the prescription opioid abuse epidemic in the United States: lessons learned from OxyContin," (2015) 72.5 *JAMA Psychiatry* 424-430.
[18] See Harrison Jacobs, *There is a big problem with the government's plan to stop the drug-overdose epidemic*, Business Insider, Mar. 14, 2016, available at http://www.businessinsider.com/robert-califf-abuse-deterrent-drugs-have-a-big-flaw- 2016-3.

120.   Through the misrepresentations and omissions described above, Defendants convinced doctors and consumers that, despite the instructions on their drug labels and the longstanding practice of prescribing opioids only in limited circumstances, there is a low risk of addiction with long-term opioid use. Additionally, Defendants convinced doctors and consumers, through their misrepresentations and omissions, that opioids are effective treatment for chronic non-cancer pain and signs of addiction could actually be signs of "pseudoaddiction" requiring heavier doses of opioids. Defendants convinced doctors and consumers in and around the Osage Nation of these same misrepresentations.

121.   Defendants' representations were false, deceptive, and unsupported. Numerous studies demonstrate the addiction and abuse risk posed by opioids, including when used to treat chronic pain. Even some of Defendants' own KOLs have admitted several of their representations regarding opioid use were false and unsupported. For example, Dr. Webster, once a wide proponent of the concept of "pseudoaddiction" for Defendants, has since stated "It obviously became too much of an excuse to give patients more medication . . . . It led us down a path that caused harm. It is already something we are debunking as a concept."

122.   In fact, according to the 2016 CDC Guidelines for Prescribing Opioids for Chronic Pain, "[e]xtensive evidence shows the possible harms of opioids," including "opioid use disorder" and "overdose." In fact, "the clinical evidence review ...did find that continuing opioid therapy for 3 months substantially increases risk for opioid use disorder." Further, "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later." Moreover, "[e]xtensive evidence suggests some benefits of non-pharmacologic and non-opioid pharmacologic treatments compared with long-term opioid therapy, with less harm."

123.   The nationwide opioid epidemic gripping this country and ravaging the State of

Oklahoma and Osage Nation also confirms that Defendants' representations about the low risk of addiction and abuse their drugs posed were false. Defendants' deceptive marketing campaign caused opioid prescription and consumption to rapidly rise across the country with devastating effects for the nation. Since 1999, sales of prescription opioids to pharmacies, hospitals and doctors' offices have quadrupled, yet according to the CDC, there has been no statistical change in the amount of pain Americans report. As opioid sales skyrocketed, there was a concomitant increase in prescription opioid overdose death and people in treatment for addiction.

124.   Drug overdose is now the leading cause of death for Americans under 50, reducing life expectancy and killing people at a faster rate than the HIV/AIDS epidemic at its peak.

125.   Defendants knew their misrepresentations were false and unsupported. Among other things, Defendants' marketing efforts often contradicted their own labels, which acknowledged the risk of abuse and addiction.

### D.   Defendants Concealed the Truth About their Campaign

126.   The nature of Defendants' marketing scheme required Defendants to conceal the truth for its' marketing to be effective. Thus, Defendants operated from behind the scenes, spreading their deceptive misrepresentations through KOLs and third-party groups to conceal their own involvement. Defendants also concealed the falsity of their misrepresentations regarding addiction risk and the benefits of long-term opioid treatment. As a result, while the opioid epidemic spread, Defendants' role and responsibility remained concealed. The Osage Nation could not have acquired such knowledge through the exercise of reasonable diligence.

#### i. Direct Marketing

127.   The Pharmaceutical Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Pharmaceutical Defendant conducted and continues to conduct advertising campaigns touting the purported benefits of opioids. For example, upon information

45

and belief, the Pharmaceutical Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

128.    Many of the Pharmaceutical Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction workers, chefs, and teachers, misleadingly implying that the drug would provide long-term pain relief and functional improvement. Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

129.    Each Pharmaceutical Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. The Pharmaceutical Defendants have not corrected this misinformation. Instead, each Defendant devoted massive resources to direct sales contacts with doctors. The Pharmaceutical Defendants spent in excess of $168 million in 2014 alone on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000.

130.    The Pharmaceutical Defendants' detailing to doctors is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Even without such studies, the Pharmaceutical Defendants purchase, manipulate, and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by an individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. Thus, the Pharmaceutical Defendants know their detailing to doctors is effective.

131.   The Pharmaceutical Defendants' detailers have been reprimanded for their deceptive promotions. In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated." Those materials in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed."[19]

### ii. Indirect Marketing

132.   The Pharmaceutical Defendants indirectly marketed their opioids using unbranded advertising, paid speakers and KOLs, and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

133.   The Pharmaceutical Defendants deceptively marketed opioids within the Osage Nation through unbranded advertising – i.e., advertising that promotes opioid use generally but does not name a specific opioid. This advertising was typically created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Pharmaceutical Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain. Much as Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, the Pharmaceutical Defendants similarly controlled the distribution of these messages in scientific publications, treatment guidelines, CME programs, and  medical conferences and seminars. To this end, the

---

[19] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010),
http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

Pharmaceutical Defendants used third-party public relations firms to help control those messages created by third parties.

134. The Pharmaceutical Defendants marketed through third parties to avoid regulatory scrutiny because that advertising is neither submitted nor reviewed by the FDA. The Pharmaceutical Defendants also used third party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, the Pharmaceutical Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

135. Pharmaceutical Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend speaker programs with meals paid for by Pharmaceutical Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug to the doctors' peers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by Defendants. Upon information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Pharmaceutical Defendants' prior misrepresentations about the risks and benefits of opioids.

136. Borrowing a page from Big Tobacco's playbook, the Pharmaceutical Defendants worked through third parties they controlled by: (a) funding, assisting, encouraging and directing doctors who served as KOLs and (b) funding, assisting, directing and encouraging seemingly neutral and credible Front Groups. The Pharmaceutical Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly

48

"neutral" guidance, such as treatment guidelines, CME programs, medical conferences and seminars, and scientific articles. Thus, the Pharmaceutical Defendants indirectly persuaded doctors and patients that what they have long known – that opioids are addictive drugs, unsafe in most circumstances for long- term use – was untrue, and that the "compassionate" treatment of pain required opioids.

137.   In 2007, multiple states sued Purdue for engaging in unfair and deceptive practices in its marketing, promotion and sale of OxyContin. Certain states settled their claims in a series of Consent Judgments that prohibited Purdue from making misrepresentations in the promotion and marketing of OxyContin in the future. By using indirect marketing strategies, however, Purdue intentionally circumvented these restrictions. Such actions included contributing to the creation of misleading publications and prescribing guidelines, which lack a reliable scientific basis and promote prescribing practices that have worsened the opioid crisis.

138.   Pro-opioid doctors are one of the most important avenues that the Pharmaceutical Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. The Pharmaceutical Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with Purdue that the Purdue website "In the Face of Pain" failed to disclose that Purdue paid doctors who provided testimonials on the site and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

**E.     Pharmaceutical Defendants' sales representatives have conveyed, and continue to convey, the message that opioids will improve patient function.**

139.   As the FDA and other agencies have made clear for years, the Pharmaceutical Defendants' claims, as described above, have no support in scientific literature.

49

140.   In 2010, the FDA warned Actavis, in response to its advertising of Kadian described above, that "we are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[20] And in 2008, upon information and belief, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

141.   The Pharmaceutical Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs (non-steroidal anti-inflammatory drugs), so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Pharmaceutical Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain. The Pharmaceutical Defendants have overstated the number of deaths from NSAIDS and have prominently featured the risks of NSAIDS, while minimizing or failing to mention the serious risks of opioids.

142.   For example, Purdue misleadingly promoted OxyContin as being unique among

---

[20] Id.

opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action. Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

143.    Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl- based IR opioids. Neither is approved for or has been shown to be safe or effective for, chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain and refused to approve Fentora for the treatment of chronic pain because of the potential harm.

144.    Despite this, upon information and belief, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe.[21] As part of this campaign,

---

[21] *See* Press Release, U.S. Dep't of Justice, *Biopharmaceutical Company, Cephalon, to Pay $425 million & Enter Plea To Resolve Allegations of Off-Label Marketing* (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain.

145.    Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses. For example:

    a. Cephalon paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

    b. Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

    c. In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

146.    The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The Pharmaceutical Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have

issued pronouncements based on the medical evidence that conclusively expose the known falsity of the Pharmaceutical Defendants' misrepresentations.

147.    Upon information and belief, the Pharmaceutical Defendants coordinated their messaging through national and regional sales and speaker trainings and coordinated advertisements and marketing materials.

148.    Moreover, at all times relevant to this Petition, the Pharmaceutical Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Pharmaceutical Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. The Pharmaceutical Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Pharmaceutical Defendants' false and misleading statements about the risks and benefits of long-term opioid use for chronic pain.

149.    Finally, the Pharmaceutical Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. The Pharmaceutical Defendants distorted the meaning or significance of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for the Pharmaceutical Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could the Osage Nation have detected it.

150.    The Pharmaceutical Defendants' efforts to artificially increase the number of opioid prescriptions directly and predictably caused a corresponding increase in opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and

has increased in parallel with [opioid] overdoses." [22] Many abusers start with legitimate prescriptions. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "[t]o reverse the epidemic of opioid drug overdose deaths and prevent opioid- related morbidity." [23] Accordingly, the Pharmaceutical Defendants' false and misleading statements directly caused the current opioid epidemic.

F.      **Defendants' Unlawful Distribution Of Opioids**

151.    In addition to common law duties to exercise reasonable care under the circumstances, [24] the Distributor Defendants owe a duty under state law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from Osage Nation's Community as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted into the Osage Nation's Community. See 63 O.S. Chapter 2 (Oklahoma Uniform Controlled Dangerous Substances Act, hereinafter "Oklahoma CSA").

152.    The Oklahoma CSA creates a legal framework for the distribution and dispensing of opioids in Oklahoma. It establishes a system of checks and balances that governs the entire supply chain of opioids and requires every person or entity that manufactures, distributes, or dispenses opioids to obtain "registration" with the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. Registrants at every level of the supply chain must fulfill their obligations under the Oklahoma CSA; otherwise there is an overwhelming risk of harm to tribes such as the Osage Nation.

---

[22] Rose A Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, Morbidity and Mortality Wkly Rep. (Jan. 1, 2016), available at https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.
[23] *Id.*
[24] This includes a duty not to create a foreseeable risk of harm to others, but also a duty to exercise reasonable care to prevent threatened harm after engaging in affirmative conduct and either realizing or should realize that such conduct has created an unreasonable risk of harm to another.

153.   Pursuant to the Oklahoma CSA and the Oklahoma Administrative Code, all opioid distributors are required to maintain effective controls against opioid diversion. Defendant Distributors must create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders can include orders of unusual size, orders that deviate from usual ordering patterns, and/or unusual frequency of orders. Thus, at a minimum to comply with these requirements, Defendant Distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of potential diversion.

154.   Oklahoma law also creates a distribution monitoring system for controlled substances and requires distributor and dispensers of controlled dangerous substances to keep records and maintain inventories.

155.   Similarly, the Oklahoma administrative code requires anyone who distributes or dispenses prescription opioids to inform the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control of suspicious orders when discovered. The code also requires reporting of theft or any significant loss of any controlled dangerous substances upon discovery of such theft or loss.

156.   The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

157.   Each Distributor Defendant repeatedly and purposefully breached its duties under common law and state law. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Plaintiff's Community.

158.   The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality within the Osage Nation. This diversion and the epidemic are direct causes of harms for which the Osage Nation seeks to recover here.

55

159.   The opioid epidemic within Osage Nation remains an immediate *hazard to public health and safety*.

160:   The Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

### i. The Distributor Defendants Negligently Failed to Control The Flow Of Opioids To Osage Nation Through Illicit Channels

161.   As part of the legal obligation to maintain effective controls against diversion, the opioid distributor is required to exercise due care in confirming the legitimacy of each and every order prior to filling. Circumstances that could be indicative of diversion include ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; ordering a disproportionate amount of controlled substances versus non-controlled prescription drugs; ordering excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors.

162.   Suspicious orders must be reported when discovered. Registrants must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted and filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility.

163.   Upon information and belief, the Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" emphasizing the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines stated: "At the center of a sophisticated supply chain,

distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

164. Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

165. These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

166. Despite their duties to prevent diversion, the Distributor Defendants have knowingly or negligently allowed diversion.[25] The Distributor Defendants' wrongful conduct and inaction have resulted in numerous civil fines and other penalties, including:

    a. In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000.[26]

    b. McKesson has a history of repeatedly failing to perform its duties. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens

---

[25] Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, Wash. Post, Oct. 15, 2017, available at https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/?utm_term=.75e86f3574d3; Lenny Bernstein, David S. Fallis, and Scott Higham, *How drugs intended for patients ended up in the hands of illegal users: 'No one was doing their job,'* Wash. Post, Oct. 22, 2016, available at https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?tid=graphics-story&utm_term=.4f439ef106a8.

[26] Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), available at https://www.justice.gov/opa/press-release/file/928476/download.

of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.

c. On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion.

d. On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

e. On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion.

f. On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion.

g. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.[27]

h. On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

i. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.

j. In December 2016, the Department of Justice announced a multi-million-dollar settlement with Cardinal for violations of the Controlled Substances Act.[28]

---

[27] Lenny Bernstein and Scott Higham, *Cardinal Health fined $44 million for opioid reporting violations*, Wash. Post, Jan. 11, 2017, available at https://www.washingtonpost.com/national/health-science/cardinal-health-fined-44-million-for-opioid-reporting-violations/2017/01/11/4f217c44-d82c-11e6-9a36-1d296534b31e_story.html?utm_term=.0c8e17245e66.

[28] Press Release, United States Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, Dec. 23, 2016, available at https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million- settlement-alleged-violations-controlled-substances-act.

k.  On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

l.  In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.

m.  In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

n.  In May of 2018, M&D was ordered to cease sales of opioids, alleging that the company failed to report unusually large narcotics shipments to drugstores. M&D had distributed excessive amounts of opioids to five of the top 10 pharmacies purchasing narcotics in Louisiana. In some cases, M&D allowed independent pharmacies to purchase six times the quantity of narcotics than they would normally order from the distributor. Despite receiving these excessively large orders, M&D never filed a suspicious activity report on any of the drugstores in question.

o.  In 2013, Walgreens agreed to pay $80 million in civil penalties related to allegations of record-keeping and dispensing violations. The allegations accused Walgreens of endangering public safety in that it allowed millions of controlled substances, including oxycodone, to reach the black market. Walgreens was barred from shipping oxycodone and other controlled drugs from its Jupiter, Florida distribution center.

167.  Although law enforcement authorities have penalized distributors, these penalties have not changed their conduct. Distributor Defendants' pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

168.  The Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion created an enormous black market for prescription opioids, which extended to the Osage Nation. Each Distributor Defendant knew or should have known that the opioids reaching the

Osage Nation were not being consumed for medical purposes and that the amount of opioids flowing to the Osage Nation was far in excess of what could be consumed for medically necessary purposes.

169. The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were inappropriately prescribing commonly-abused opioids; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Plaintiff's Community; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and exercising common sense.

170. Upon information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing the areas around the Osage Nation's Community in order to perform due diligence inspections to ensure that the controlled substances the Distributor Defendants had furnished were not being diverted to illegal uses.

171. Upon information and belief, the compensation the Distributor Defendants provided to certain employees was affected by the volume of their sales of opioids to pharmacies and other facilities servicing the areas around the Osage Nation's Community. This improperly created incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

172. It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the market in and around the Osage Nation's Community with highly addictive opioids

would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

173.    It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death. It is also reasonably foreseeable that many of these injuries will be suffered by the citizens of Osage Nation, and that the costs of these injuries will be borne by Osage Nation.

174.    The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic faced by Osage Nation, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

175.    The Distributor Defendants were aware of widespread prescription opioid abuse in and around the Osage Nation's Community, but upon information and belief, they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in those areas in such quantities that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

176.    The use of opioids by citizens of Osage Nation who were addicted or who did not have a medically necessary purpose could not occur without the knowing cooperation and assistance of the Distributor Defendants. If the Distributor Defendants adhered to effective controls to guard against diversion, the citizens of Osage Nation and Osage Nation would have avoided significant injury.

177.    The Distributor Defendants made substantial profits over the years based on the diversion of opioids into Osage Nation. The Distributor Defendants knew that Osage Nation would be unjustly forced to bear the costs of these injuries and damages.

178.    The Distributor Defendants' intentional distribution of excessive amounts of

prescription opioids within Osage Nation showed an intentional or reckless disregard for the safety of Osage Nation and its citizens. Their conduct poses a continuing threat to the health, safety, and welfare of the Osage Nation.

179.    The Distributor Defendants' violations constitute prima facie evidence of negligence.

### ii. The Pharmaceutical Defendants Negligently Failed to Control The Flow Of Opioids Within Osage Nation Through Illicit Channels

180.    The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescriptions opioids that were incumbent upon the Distributor Defendants were also legally required of the Pharmaceutical Defendants under state law.

181.    Like the Distributor Defendants, the Pharmaceutical Defendants are required to design and operate a system to detect suspicious orders, and to report such orders to law enforcement. See 63 O.S. Chapter 2 (Oklahoma CSA). The Pharmaceutical Defendants have not done so.

182.    Upon information and belief, for over a decade the Pharmaceutical Defendants have been able to track the distribution and prescribing of their opioids down to the retail and prescriber level. Thus, the Pharmaceutical Defendants had actual knowledge of the prescribing practices of doctors, including practices that raised red flags. Yet, the Pharmaceutical Defendants did not report those red flags, nor did they cease marketing to those doctors. Like the Distributor Defendants, the Pharmaceutical Defendants breached their duties under common law and state law.

183.    The Pharmaceutical Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The Pharmaceutical Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the

manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Pharmaceutical Defendants knew the volume, frequency, and pattern of opioid orders being placed and filled. The Pharmaceutical Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

184.    The Department of Justice recently fined Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[29] Before the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report suspicious orders for controlled substances – orders that are unusual in their frequency, size, or other patterns. . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[30] Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."[31]

185.    Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Through its extensive network of sales representatives, Purdue had and continues to have knowledge of the prescribing practices of

---

[29] *See* Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million- settlement-failure-report-suspicious- orders.
[30] *Id.*
[31] 2017 Mallinckrodt MOA at p. 2-3.

thousands of doctors and could identify doctors who displayed red flags for diversion such as those whose waiting rooms were overcrowded, whose parking lots had numerous out-of-state vehicles, and whose patients seemed young and healthy or homeless. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.[32] Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In doing so, Purdue protected its own profits at the expense of public health and safety.

186.  Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the New York Attorney General found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list. The Attorney General also found that, in certain cases where Endo's sales representatives detailed prescribers who were convicted of illegal prescribing of opioids, those representatives could have recognized potential signs of diversion and reported those prescribers but failed to do so.

187.  Upon information and belief, the other Pharmaceutical Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

---

[32] Scott Glover and Lisa Girion, *OxyContin maker closely guards its list of suspect doctors*, L.A. Times, August 11, 2013, available at http://articles.latimes.com/2013/aug/11/local/la-me-rx-purdue-20130811.

188.    The Pharmaceutical Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids into Osage Nation.

## V.    CAUSES OF ACTION

### A.    Public Nuisance (Against all Defendants)

189.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

190.    Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injury the property, health, safety and/or comfort of a considerable number of persons in Osage Nation by their production, promotion, and marketing of opioids for use by citizens of Osage Nation.

191.    Defendants' misrepresentations and omissions regarding opioids, as set forth above, have created an opioid addiction epidemic in Osage Nation that constitutes a public nuisance. Defendants have created a condition that affects entire communities, neighborhoods, and considerable numbers of persons at the same time.

192.    Defendants' misrepresentations and omissions regarding opioids constitute unlawful acts and/or omissions of duties, which annoy, injure, or endanger the comfort, repose, health, and/or safety of others, and offend decency to a considerable number of persons in Osage Nation. It has even caused deaths, serious injuries, and a severe disruption of public peace, order and safety.

193.    Defendants have a duty to abate the nuisance caused by the prescription opioid epidemic.

194.    Defendants have failed to abate the nuisance they created.

195. Defendants' conduct directly and proximately caused injury to Osage Nation and its citizens.

196. As a direct result of Defendants' conduct, the Osage Nation and its tribal members have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, social services and other services, lost tax revenue, as well as injury and death of citizens of Osage Nation.

197. Defendants are liable to Osage Nation for the costs borne by it as a result of the opioid epidemic and for the costs of abating the nuisance created by Defendants.

**B.    Fraud: Actual and Constructive (Against All Defendants)**

198. Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

199. Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and concealed facts material to Osage Nation and its citizens to induce them to purchase, administer, and consume opioids as set forth in detail above.

200. Defendants knew at the time that they made their misrepresentations that they were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Namely, Defendants knowingly and/or recklessly:

   a.  downplayed the substantial risks of addiction and other side-effects of their opioids, including affirmatively stating in sales calls and other marketing outlets that their drugs were not as addictive as they truly are, stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring more opioid treatment, and omitting the high risk of addiction actually present;

   b.  overstated the efficacy of their opioids, including making false statements regarding the effectiveness of the drugs for treating chronic non-cancer pain and their ability to improve function; and

66

c. misrepresented the medical usefulness and necessity of their opioids, including affirmatively marketing their drugs for off label uses without solicitation and not in response to questions from healthcare providers.

201.   Defendants intended that Osage Nation and its citizens would rely on their misrepresentations regarding the risks, efficacy, and medical necessity of their opioids, to increase the number of opioid prescriptions and users amongst the Osage Nation tribal membership.

202.   Osage Nation and its citizens reasonably relied upon Defendants' misrepresentations, and that Defendants would not conceal material facts.

203.   Defendants are liable to Osage Nation for their actual fraud.

204.   Defendants had a legal and/or equitable duty to disclose the dangerous and addictive nature of opioids and prevent their diversion. Instead, Defendants mislead the medical community and the citizens of Osage Nation and flooded the market with their dangerous drugs. Defendants had a duty to accurately disclose the dangers of opioids, and not mislead the public in order to make profits.

205.   Defendants' conduct constitutes constructive fraud for which Defendants are liable to Osage Nation.

206.   As a result of Defendants' actual and constructive fraud, the Osage Nation has suffered actual damages, including but not limited to, significant costs related to healthcare, undermining of the economic productivity of its citizens, and the harming of the long-term health and welfare of the people of the Osage Nation.

207.   Defendants' repeated and continuing conduct was willful, wanton, and malicious and was directed at the public generally. As a result, Osage Nation seeks to recover punitive damages against Defendants.

## C.   Negligence and Negligent Misrepresentation (Against All Defendants)

208.   Plaintiff incorporates the allegations set forth above as if they were fully set forth

67

herein.

209. Defendants had a legal duty to act with the exercise of ordinary care or skill to prevent injury to another.

210. Defendants breached this duty through their deceptive marketing campaign, distributions of opioids, and failure to divert opioids from illicit channels. Defendants knew of the highly addictive nature and dangers of prescription opioids. Yet, Defendants' negligently misrepresented and omitted the danger of opioids to consumers, including in the Osage Nation and its citizens, in a coordinated effort to sell more opioids.

211. Defendants' repeated and continuing breach of their duty of care directly and proximately caused damage to the Osage Nation.

**D.    Civil Conspiracy (Against All Defendants)**

212. Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

213. Defendants engaged in a civil conspiracy in their unlawful marketing of opioids and/or distribution of opioids into the Osage Nation's territory

214. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein.

215. Defendants' conspiracy, and Defendants' repeated and continuing actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

**E.    Unjust Enrichment (Against All Defendants)**

216. Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

217. Defendants received a benefit in the form of billions of dollars in revenue from the sale of prescription opioids to treat chronic pain.

218.    Defendants were aware they were receiving that benefit. Defendants' repeated and continuing conduct was designed to bring about that benefit.

219.    Defendants retained that benefit at the expense of the Osage Nation, who has borne, and who continues to bear, the economic and social costs of Defendants' scheme.

220.    It is inequitable for the Defendants to retain that benefit without paying for it.

221.    The Osage Nation is entitled to recover from Defendants' prescription opioid profits the amounts Osage Nation has spent and will have to spend in the future to address the effects of Defendants' actions.

**F.      Punitive Damages**

222.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

223.    Defendants acted with malice, purposely, and intentionally.  At a minimum, Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

224.    Osage Nation is entitled to punitive damages in addition to actual damages from Defendants.

## JURY TRIAL DEMAND

225.    Plaintiff hereby requests a trial by jury.

## RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

1.      Enter Judgment in favor of Plaintiff against each of Defendants awarding Plaintiff its actual damages for the damages caused by the opioid epidemic, including but not limited to: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other

treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; (5) costs associated with law enforcement and public safety relating to the opioid epidemic; and (6) costs associated with drug court and other resources expended through the judicial system.

2.      Order that Defendants compensate Plaintiff for past and future costs to abate  the ongoing public nuisance caused by the opioid epidemic;

3.      Order Defendants to fund an "abatement fund" for the purposes of abating the opioid nuisance;

4.      Enter judgment against Defendants requiring Defendants to pay punitive damages;

5.      Enter judgment against Defendants awarding Plaintiff its reasonable attorneys' fees, all costs and expenses, pre-judgment and post-judgment interest; and,

6.      All other such and further relief as this Court may deem just and proper.


Respectfully submitted,


M. David Riggs, OBA #7583
Lisa R. Riggs, OBA #16944
RIGGS, ABNEY, NEAL, TURPEN,
  ORBISON & LEWIS, P.C.
502 West Sixth Street
Tulsa, OK 74119
Tel: (918) 587-3161
Fax: (918) 587-9708
driggs@riggsabney.com
lriggs@riggsabney.com

-and-


70

Curtis "Muskrat" Bruehl, OBA #19418
Matthew J. Sill, OBA #21547
Harrison C. Lujan, OBA #30154
FULMER SILL LAW GROUP
P.O. Box 2448
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK 73103
Phone/Fax: 405-510-0077
cbruehl@fulmersill.com
msill@fulmersill.com
hlujan@fulmersill.com

*Attorneys for The Osage Nation*

71

# EXHIBIT 4

IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

ORIGINAL
PLEASE RETURN TO
COURT CLERKS OFFICE

THE OSAGE NATION,

        Plaintiff,

vs.

PURDUE PHARMA L.P., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)

Case No.: C J-19-135

## SUMMONS

To:    AmerisourceBergen Corporation
       RA: The Corporation Company
       1833 S. Morgan Rd.
       Oklahoma City, OK 73128

      You have been sued by the above-named plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

      Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

      Issued this   **24**   day of July, 2019.

                              JENNIFER BURD
                              COURT CLERK

                By _____
                             Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff:    LISA R. RIGGS - OBA #16944
                         M. DAVID RIGGS – OBA #
                         RIGGS, ABNEY, NEAL, TURPEN, ORBISON
                           & LEWIS
                         502 West Sixth Street
                         Tulsa, OK 74119-1016
                         Tel: (918) 587-3161 / Fax: (918) 587-9708

This summons was served on _____.
                             (Date of Service)

                         _____
                         Signature of person serving summons

**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.**

**Return ORIGINAL for filing.**
**RETURN OF SERVICE**

IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                    )
                                     )
            Plaintiff,               )
                                     )
vs.                                  )     Case No.:  CS-19-135
                                     )
PURDUE PHARMA L.P., et al.           )
                                     )
            Defendants.              )

ORIGINAL
PLEASE RETURN
COURT CLERKS OFFICE

## SUMMONS

To:    Cardinal Health, Inc.
       RA: CT Corporation System
       4400 Easton Commons Way, Suite 125
       Columbus, OH 43219

        You have been sued by the above-named plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service.  Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

        Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

        Issued this **26** day of July, 2019.

                                JENNIFER BURD
                                COURT OF CLERK

                        By  _____
                                Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff:      LISA R. RIGGS - OBA #16944
                                M. DAVID RIGGS – OBA #7583
                                RIGGS, ABNEY, NEAL, TURPEN, ORBISON
                                  & LEWIS
                                502 West Sixth Street
                                Tulsa, OK  74119-1016
                                Tel: (918) 587-3161 / Fax: (918) 587-9708

This summons was served on _____.
                                (Date of Service)

                        _____
                        Signature of person serving summons

**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER.   SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.**

**Return ORIGINAL for filing.**

IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                )
                                 )
            Plaintiff,           )
                                 )
vs.                              )      Case No.: C J-19-135
                                 )
PURDUE PHARMA L.P., et al.       )
                                 )
            Defendants.          )

## SUMMONS

To:   Johnson & Johnson
      One Johnson & Johnson Plaza
      New Brunswick, NJ 08933

        You have been sued by the above-named plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service.  Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

        Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

        Issued this **26** day of July, 2019.

                                        JENNIFER BURD
                                        COURT OF CLERK

                                By _____
                                        Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff:

        LISA R. RIGGS - OBA #16944
        M. DAVID RIGGS – OBA #7583
        RIGGS, ABNEY, NEAL, TURPEN, ORBISON
          & LEWIS
        502 West Sixth Street
        Tulsa, OK  74119-1016
        Tel: (918) 587-3161 / Fax: (918) 587-9708

This summons was served on _____
                                (Date of Service)

                                _____
                                Signature of person serving summons

**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER.   SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.**

**Return ORIGINAL for filing.**

IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                    )
                                     )
            Plaintiff,               )
                                     )
vs.                                  )   Case No.: CJ-19-135
                                     )
PURDUE PHARMA L.P., et al.           )
                                     )
            Defendants.              )

## SUMMONS

To:    McKesson Corporation
       RA: Corporation Service Company
       10300 Greenbriar Place
       Oklahoma City, OK 73159

       You have been sued by the above-named plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service.  Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

       Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

       Issued this _26_ day of July, 2019.

                                        **JENNIFER BURD**
                                        COURT OF CLERK

                               By _____
                                        Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff:
                    LISA R. RIGGS - OBA #16944
                    M. DAVID RIGGS – OBA #7583
                    RIGGS, ABNEY, NEAL, TURPEN, ORBISON
                      & LEWIS
                    502 West Sixth Street
                    Tulsa, OK  74119-1016
                    Tel: (918) 587-3161 / Fax: (918) 587-9708

This summons was served on _____.
                              (Date of Service)

                               _____
                               Signature of person serving summons

**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER.   SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.**

**Return ORIGINAL for filing.**

IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                        )
                                         )
              Plaintiff,                 )
                                         )
vs.                                      )
                                         )   Case No.:  CJ-19-135
PURDUE PHARMA L.P., et al.               )
                                         )
              Defendants.                )
                                         )

## SUMMONS

To:    The Purdue Frederick Company
       RA: Corporation Service Company
       80 State St.
       Albany, NY 12207

       You have been sued by the above-named plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service.  Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

       Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

       Issued this 26 day of July, 2019.

                                         JENNIFER BURG,
                                         COURT OF CLERK

                                    By   Jen Born
                                         Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff:
                    LISA R. RIGGS - OBA #16944
                    M. DAVID RIGGS – OBA #7583
                    RIGGS, ABNEY, NEAL, TURPEN, ORBISON
                      & LEWIS
                    502 West Sixth Street
                    Tulsa, OK  74119-1016
                    Tel: (918) 587-3161 / Fax: (918) 587-9708

This summons was served on _____.
                                (Date of Service)


                                    _____
                                    Signature of person serving summons

**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER.   SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.**

**Return ORIGINAL for filing.**



IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )      Case No.: C J-19-135
                                     )
PURDUE PHARMA L.P., et al.           )
                                     )
        Defendants.                  )

## SUMMONS

To:  Purdue Pharma, L.P.
     RA: The Prentice-Hall Corporation System, Inc.
     251 Little Falls Drive
     Wilmington, DE 19808

        You have been sued by the above-named plaintiff, and you are directed to file a written
answer to the attached petition in the court at the above address within twenty (20) days after
service of this summons upon you, exclusive of the day of service.  Within the same time, a copy
of your answer must be delivered or mailed to the attorney for the plaintiff.

        Unless you answer the petition within the time stated, judgment will be rendered against
you with costs of the action.

        Issued this **26** day of July, 2019.

                                    JENNIFER BURD
                                    COURT OF CLERK

                              By _____
                                    Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff:      LISA R. RIGGS - OBA #16944
                                M. DAVID RIGGS – OBA #7583
                                RIGGS, ABNEY, NEAL, TURPEN, ORBISON
                                  & LEWIS
                                502 West Sixth Street
                                Tulsa, OK  74119-1016
                                Tel: (918) 587-3161 / Fax: (918) 587-9708

This summons was served on _____.
                                (Date of Service)


                              _____
                              Signature of person serving summons

**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED
WITH THIS SUIT OR YOUR ANSWER.   SUCH ATTORNEY SHOULD BE
CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE
TIME LIMIT STATED IN THE SUMMONS.**

**Return ORIGINAL for filing.**

IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                    )
                                     )
            Plaintiff,               )
                                     )
vs.                                  )      Case No.: C3-19-135
                                     )
PURDUE PHARMA L.P., et al.           )
                                     )
            Defendants.              )
                                     )

## SUMMONS

To:    Purdue Pharma Inc.
       RA: Corporation Service Company
       80 State St.
       Albany, NY 12207

       You have been sued by the above-named plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service.  Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

       Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

       Issued this **26** day of July, 2019.

                                            **JENNIFER BURD**
                                            COURT OF CLERK

                                     By _____
                                            Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff:      LISA R. RIGGS - OBA #16944
                                M. DAVID RIGGS – OBA #7583
                                RIGGS, ABNEY, NEAL, TURPEN, ORBISON
                                  & LEWIS
                                502 West Sixth Street
                                Tulsa, OK  74119-1016
                                Tel: (918) 587-3161 / Fax: (918) 587-9708

This summons was served on _____.
                                   (Date of Service)

                                     _____
                                     Signature of person serving summons


**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER.   SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.**

**Return ORIGINAL for filing.**

# EXHIBIT 5

IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                              )
                                               )
                    Plaintiff,                 )
                                               )
vs.                                            )      Case No.: CJ-19-135
                                               )
PURDUE PHARMA L.P., et al.                     )
                                               )
                    Defendants.                )

District Court Osage County, Okla.
FILED

*5*   AUG 07 2019

Jennifer Burd, Court Clerk
By_____ Deputy

## ORDER GRANTING APPLICATION TO WITHDRAW AS COUNSEL OF RECORD

UPON Application of M. David Riggs and Lisa R. Riggs, of Riggs, Abney, Neal, Turpen,

Orbison and Lewis, PC, for an Order allowing them to withdraw as counsel for Plaintiff, The

Osage Nation, and for good cause shown, the Court finds that same should be granted.

IT IS SO ORDERED this 7th day of August, 2019.

_____
JUDGE OF THE DISTRICT COURT

*Prepared by:*
Lisa R. Riggs, OBA #16944
RIGGS, ABNEY, NEAL, TURPEN,
   ORBISON & LEWIS, P.C.
502 West Sixth Street
Tulsa, Oklahoma 74119-1016
Tel: (918) 587-3161
Fax: (918) 587-9708

**EXHIBIT**
" 1 "

# EXHIBIT 6

IN THE DISTRICT COURT IN AND FOR OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )   Case No.: CJ-19-115
                                     )
PURDUE PHARMA L.P., et al.           )
                                     )
        Defendants.                  )

District Court Osage County, Okla.
FILED

S  AUG 07 2019

Jennifer Burd, Court Clerk
By_____ Deputy

## APPLICATION TO WITHDRAW AS COUNSEL OF RECORD

COME NOW M. David Riggs and Lisa R. Riggs, of Riggs, Abney, Neal, Turpen, Orbison and Lewis, PC, and apply to this Court pursuant to 12 O.S. § 2005.2(C) for an Order allowing them and Riggs, Abney, Neal, Turpen, Orbison and Lewis, PC to withdraw as attorneys for Plaintiff, The Osage Nation.

In support of this Application, counsel state that Plaintiff will continue to be represented by Curtis Bruehl, Matthew J. Sill and Harrison C. Lujan, of Fulmer Sill Law Group. Mr. Bruehl, Mr. Sill and Mr. Luhan previously appeared on behalf of the Plaintiff and their present address is as follows: Fulmer Sill Law Group, P.O. Box 2448, 1101 N. Broadway Avenue, Suite 102, Oklahoma City, OK 73103.

These attorneys' withdrawal will not delay the action or prejudice the rights of any party.

Currently, there are no hearings scheduled in this matter, and no appearance or answer has been filed by and Defendant in this matter.

Plaintiff, The Osage Nation, has knowledge of and consents to Counsels' withdrawal.

WHEREFORE, the undersigned respectfully request that their Application to Withdraw be granted. A proposed Order is attached hereto as Exhibit 1.

Respectfully submitted,

By *[signature]*

M. David Riggs, OBA #7583
Lisa R. Riggs, OBA #16944
RIGGS, ABNEY, NEAL, TURPEN,
   ORBISON & LEWIS, P.C.
502 West Sixth Street
Tulsa, Oklahoma 74119-1016
Tel: (918) 587-3161
Fax: (918) 587-9708

## CERTIFICATE OF MAILING

This is to certify that on the __7__ day of __August__, 2019 a true and correct copy of the above and foregoing instrument, with attachments, was served via U.S. Mail, with proper postage thereon fully prepaid, to:

Curtis "Muskrat" Bruehl, OBA #19418
Matthew J. Sill, OBA #21547
Harrison C. Lujan, OBA #30154
FULMER SILL LAW GROUP
P.O. Box 2448
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK 73103
Phone/Fax: 405-510-0077
cbruehl@fulmersill.com
msill@fulmersill.com
hlujan@fulmersill.com
*Attorneys for The Osage Nation*

Holli A. Wells, Esq.
hwells@osagenation-nsn.gov
Attorney General
Osage Nation
1223 Grandview
Pawhuska, OK  74056

*[signature]*

Lisa R. Riggs

# EXHIBIT 7

**IN THE DISTRICT COURT OF OSAGE COUNTY**
**STATE OF OKLAHOMA**

THE OSAGE NATION,        )
                         )
    Plaintiff,           )
                         )
v.                       )        Case No.  CJ-2019-135
                         )        Judge Stuart Tate
PURDUE PHARMA L.P.,  et al.,   )
                         )
    Defendants.          )

District Court Osage County, Okla.
FILED

AUG 1 6 2019

Jennifer Burd, Court Clerk
By_____ Deputy

**ATTORNEY ENTRY OF APPEARANCE FOR**
**AMERISOURCEBERGEN DRUG CORPORATION**

Pursuant to 12 O.S. § 2005.2(A), D. Michael McBride III and Susan E. Huntsman, of the

firm Crowe & Dunlevy, A Professional Corporation, enter an appearance in this case as counsel

for specially appearing Defendant AmerisourceBergen Drug Corporation, who is to be

substituted for the improperly named AmerisourceBergen Corporation. This entry of appearance

is filed without waiver of any procedural rights, objections, or defenses.

DATED August 15 , 2019.          Respectfully submitted,

D. Michael McBride III, OBA #15431
Susan E. Huntsman, OBA #18401
CROWE & DUNLEVY
A PROFESSIONAL CORPORATION
500 Kennedy Building
321 South Boston Avenue
Tulsa, OK 74103-3313
(918) 592-9800
(918) 592-9801 (Facsimile)

ATTORNEYS FOR DEFENDANT
AMERISOURCEBERGEN DRUG
CORPORATION

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing was mailed, postage prepaid, this ___5th___ day of August, 2019, to:

Curtis "Muskrat" Bruehl
Matthew J. Sill
Harrison C. Lujan
FULMER SILL LAW GROUP
P.O. Box 2448
1101 N. Broadway Ave., Ste. 102
Oklahoma City, OK 73103
*Attorneys for Plaintiff*

Stuart D. Campbell
DOERNER, SAUNDERS, DANIEL & ANDERSON,
L.L.P.
700 Williams Center Tower II
2 W. 2nd St.
Tulsa, OK 74103-3522
*Attorneys for Defendant McKesson
Corporation*

Kaylee Davis-Maddy
DOERNER, SAUNDERS, DANIEL & ANDERSON,
L.L.P.
210 Park Avenue, Ste. 1200
Oklahoma City, OK 73102
*Attorneys for Defendant McKesson
Corporation*

Ryan A. Ray
NORMAN WOHLGEMUTH CHANDLER JETER
BARNETT & RAY, P.C.
2900 Mid-Continent Tower
401 S. Boston Ave.
Tulsa, OK 74103
*Attorneys for Defendants Cardinal Health, Inc.*

Susan E. Huntsman

2

# EXHIBIT 8

**IN THE DISTRICT COURT OF OSAGE COUNTY**
**STATE OF OKLAHOMA**

THE OSAGE NATION,                                    )
                                                     )
      Plaintiff,                                )
                                                     )
vs.                                                  )     Case No. CJ-2019-135
                                                     )     Judge~~Stuart Tate~~
(1)  PURDUE PHARMA L.P.,                        )
(2)  PURDUE PHARMA INC.,                        )
(3)  THE PURDUE FREDERICK COMPANY,              )
(4)  CEPHALON, INC.,                            )
(5)  TEVA PHARMACEUTICAL INDUSTRIES,            )
      LTD.,                                 )
(6)  TEVA PHARMACEUTICALS US, INC.,             )
(7)  JANSSEN PHARMACEUTICALS, INC.,             )
(8)  JOHNSON & JOHNSON,                         )
(9)  ORTHO-MCNEIL-JANSSEN                       )
      PHARMACEUTICALS, INC.,                )
(10) JANSSEN PHARMACEUTICA, INC.,               )
(11) ENDO HEALTH SOLUTIONS INC.,                )
(12) ENDO PHARMACEUTICALS INC.,                 )
(13) PAR PHARMACEUTICALS, INC.,                 )
(14) ALLERGAN PLC,                              )
(15) ACTAVIS PLC,                               )
(16) WATSON PHARMACEUTICAL, INC.                )
(17) WATSON LABORATORIES, INC.,                 )
(18) ACTAVIS PHARMA, INC.,                      )
(19) WATSON PHARMA, INC.,                       )
(20) ACTAVIS LLC,                               )
(21) MALLINCKRODT PLC,                          )
(22) MALLINCKRODT LLC,                          )
(23) SPECGX, LLC,                               )
(24) MYLAN PHARMACEUTICALS INC.,                )
(25) SANDOZ, INC.,                              )
(26) MCKESSON CORP.,                            )
(27) CARDINAL HEALTH, INC.,                     )
(28) AMERISOURCEBERGEN DRUG CORP.,              )
(29) WALGREENS BOOTS ALLIANCE, INC.             )
      a/k/a WALGREEN CO.,                   )
(30) MORRIS & DICKSON CO, LLC,                  )
(31) WAL-MART INC. f/k/a/ WAL-MART              )
      STORES INC.,                          )
(32) MCQUEARY BROTHERS DRUG                     )
      COMPANY, LLC, and                     )

District Court, Osage County, Okla.
FILED

AUG 1 9 2019

JENNIFER BURD, Court Clerk
By_____
               Deputy

(33)   SAJ DISTRIBUTORS,                    )
                                            )
       Defendants.                          )

### ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION
### TO SUBSTITUTE PARTY AND FOR ENLARGEMENT OF TIME
### TO ANSWER, MOVE OR OTHERWISE RESPOND

NOW on this *19th* day of *August*, 2019, Defendants McKesson Corporation, AmerisourceBergen Drug Corporation, Cardinal Health, Inc. and The Harvard Drug Group, LLC's Unopposed Motion to Substitute Party and Enlarge Time to Answer, Move or otherwise Respond to Plaintiff's Petition comes before this Court. Upon consideration of Defendants' Motion, and for good cause shown, this Court finds that Defendants' Motion should be granted.

**IT IS THEREFORE ORDERED** that AmerisourceBergen Drug Corporation shall be substituted as party defendant in place of the improperly named AmerisourceBergen Corporation. All future captions shall reflect this change.

**IT IS FURTHER ORDERED** that Defendants McKesson Corporation, AmerisourceBergen Drug Corporation, Cardinal Health, Inc. and The Harvard Drug Group, LLC are granted an extension of time to respond to Plaintiff's Petition until October 21, 2019.

Honorable Stuart Tate
Judge of the District Court

2

**DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.**

Stuart D. Campbell, OBA #11246
700 Williams Center Tower II
Two West Second Street
Tulsa, Oklahoma 74103-3522
Telephone:  (918) 591-5242
Facsimile:  (918) 925-5242
E-mail:  scampbell@dsda.com

Kaylee Davis-Maddy, OBA #31534
Hightower Building
105 N. Hudson Ave, Suite 1000
Oklahoma City, OK 73102
Telephone:  405-319-3513
E-mail:  kmaddy@dsda.com

*COUNSEL FOR DEFENDANT, MCKESSON CORPORATION*

Ryan A. Ray, OBA #22281
NORMAN WOHLGEMUTH CHANDLER JETER BARNETT & RAY, P.C.
2900 Mid-Continent Tower
401 South Boston Avenue
Tulsa, Oklahoma 74103
rar@nwcjlaw.com

*Attorneys for Cardinal Health, Inc.
and The Harvard Drug Group, LLC*

D. Michael McBride III, OBA #15431
Susan E. Huntsman, OBA #18401
Crowe & Dunlevy
A Professional Corporation
500 Kennedy Building
321 S. Boston Ave.
Tulsa, OK  74103
(918) 592-9800
(918) 591-9801 (Facsimile)
mike.mcbride@crowedunlevy.com
susan.huntsman@crowedunlevy.com

*Attorneys for Defendant AmerisourceBergen Drug Corporation*

5081841.1

3

# EXHIBIT 9

## IN THE DISTRICT COURT OF OSAGE COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| THE OSAGE NATION, | ) |
|      Plaintiff, | ) |
| | ) |
| vs. | )    Case No. CJ-2019-135 |
| | )    Judge Stuart Tate |
| (1)  PURDUE PHARMA L.P., | ) |
| (2)  PURDUE PHARMA INC., | ) |
| (3)  THE PURDUE FREDERICK COMPANY, | ) |
| (4)  CEPHALON, INC., | ) |
| (5)  TEVA PHARMACEUTICAL INDUSTRIES, LTD., | ) |
| (6)  TEVA PHARMACEUTICALS US, INC., | ) |
| (7)  JANSSEN PHARMACEUTICALS, INC., | ) |
| (8)  JOHNSON & JOHNSON, | ) |
| (9)  ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., | ) |
| (10) JANSSEN PHARMACEUTICA, INC., | ) |
| (11) ENDO HEALTH SOLUTIONS INC., | ) |
| (12) ENDO PHARMACEUTICALS INC., | ) |
| (13) PAR PHARMACEUTICALS, INC., | ) |
| (14) ALLERGAN PLC, | ) |
| (15) ACTAVIS PLC, | ) |
| (16) WATSON PHARMACEUTICAL, INC. | ) |
| (17) WATSON LABORATORIES, INC., | ) |
| (18) ACTAVIS PHARMA, INC., | ) |
| (19) WATSON PHARMA, INC., | ) |
| (20) ACTAVIS LLC, | ) |
| (21) MALLINCKRODT PLC, | ) |
| (22) MALLINCKRODT LLC, | ) |
| (23) SPECGX, LLC, | ) |
| (24) MYLAN PHARMACEUTICALS INC., | ) |
| (25) SANDOZ, INC., | ) |
| (26) MCKESSON CORP., | ) |
| (27) CARDINAL HEALTH, INC., | ) |
| (28) AMERISOURCEBERGEN DRUG CORP., | ) |
| (29) WALGREENS BOOTS ALLIANCE, INC. a/k/a WALGREEN CO., | ) |
| (30) MORRIS & DICKSON CO, LLC, | ) |
| (31) WAL-MART INC. f/k/a/ WAL-MART STORES INC., | ) |
| (32) MCQUEARY BROTHERS DRUG COMPANY, LLC, and | ) |

District Court, Osage County, Okla.
FILED

AJG 19 2019

JENNIFER BURD, Court Clerk
By_____ Deputy

(33)  SAJ DISTRIBUTORS,                                      )
                                                             )
        Defendants.                                          )
                                                             )

## ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION
## TO SUBSTITUTE PARTY AND FOR ENLARGEMENT OF TIME
## TO ANSWER, MOVE OR OTHERWISE RESPOND

NOW on this 19ᵗʰ day of *August* , 2019, Defendants McKesson Corporation,

AmerisourceBergen Drug Corporation, Cardinal Health, Inc. and The Harvard Drug Group,

LLC's Unopposed Motion to Substitute Party and Enlarge Time to Answer, Move or otherwise

Respond to Plaintiff's Petition comes before this Court.   Upon consideration of Defendants'

Motion, and for good cause shown, this Court finds that Defendants' Motion should be granted.

    IT IS THEREFORE ORDERED that AmerisourceBergen Drug Corporation shall be

substituted as party defendant in place of the improperly named AmerisourceBergen

Corporation.  All future captions shall reflect this change.

    IT IS FURTHER ORDERED that Defendants McKesson Corporation,

AmerisourceBergen Drug Corporation, Cardinal Health, Inc. and The Harvard Drug Group, LLC

are granted an extension of time to respond to Plaintiff's Petition until October 21, 2019.

                                        _____
                                        Honorable Stuart Tate
                                        Judge of the District Court

2

**DOERNER, SAUNDERS, DANIEL
& ANDERSON, L.L.P.**

Stuart D. Campbell, OBA #11246
700 Williams Center Tower II
Two West Second Street
Tulsa, Oklahoma 74103-3522
Telephone:  (918) 591-5242
Facsimile:  (918) 925-5242
E-mail:  scampbell@dsda.com

Kaylee Davis-Maddy, OBA #31534
Hightower Building
105 N. Hudson Ave, Suite 1000
Oklahoma City, OK 73102
Telephone:  405-319-3513
E-mail:  kmaddy@dsda.com

COUNSEL FOR DEFENDANT, MCKESSON CORPORATION

Ryan A. Ray, OBA #22281
NORMAN WOHLGEMUTH CHANDLER JETER BARNETT & RAY, P.C.
2900 Mid-Continent Tower
401 South Boston Avenue
Tulsa, Oklahoma 74103
rar@nwcjlaw.com

*Attorneys for Cardinal Health, Inc.
and The Harvard Drug Group, LLC*

D. Michael McBride III, OBA #15431
Susan E. Huntsman, OBA #18401
Crowe & Dunlevy
A Professional Corporation
500 Kennedy Building
321 S. Boston Ave.
Tulsa, OK  74103
(918) 592-9800
(918) 591-9801 (Facsimile)
mike.mcbride@crowedunlevy.com
susan.huntsman@crowedunlevy.com

*Attorneys for Defendant AmerisourceBergen Drug Corporation*

5081841.1

3

# EXHIBIT 10

IN THE DISTRICT COURT OF OSAGE COUNTY
STATE OF OKLAHOMA

District Court Clerk County, Okla.
FILED
AUG 1 9 2019
Jennifer Floyd Court Clerk
By_____ Deputy

THE OSAGE NATION,                    )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )   Case No. CJ-2019-135
                                     )
PURDUE PHARMA, L.P., *et al.*,       )   The Honorable Stuart Tate
                                     )
        Defendants.                  )

## ENTRY OF APPEARANCE

In accordance with 12 *Okla. Stat.* § 2005.2 and specifically without waiving any 12 *Okla. Stat.* § 2012 defense, Ryan A. Ray of the firm Norman Wohlgemuth Chandler Jeter Barnett & Ray, P.C., hereby enters his appearance as counsel for the Defendant, Cardinal Health, Inc., and requests that all filings and correspondence be mailed to his attention at 2900 Mid-Continent Tower, 401 South Boston Avenue, Tulsa, Oklahoma 74103-4023.

Respectfully submitted,

Ryan A. Ray, OBA #22281
NORMAN WOHLGEMUTH CHANDLER
JETER BARNETT & RAY, P.C.
2900 Mid-Continent Tower
401 S. Boston Avenue
Tulsa, OK 74103
(918) 583-7571
(918) 584-7847 (Facsimile)

**ATTORNEY FOR DEFENDANT,
CARDINAL HEALTH, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing to be served upon the following counsel of record by directing service via U.S. Mail on this _____ day of August, 2019:

| | |
|---|---|
| Curtis "Muskrat" Bruehl<br>Matthew J. Sill<br>Harrison C. Lujan<br>FULMER SILL LAW GROUP<br>P.O. Box 2448<br>1101 N. Broadway Ave., Suite 102<br>Oklahoma City, OK  73103 | |
| Stuart D. Campbell<br>DOERNER SAUNDERS DANIEL &<br>ANDERSON, LLP<br>700 Williams Center Tower II<br>Two West Second Street<br>Tulsa, OK  74103-3522 | Kaylee Davis-Maddy<br>DOERNER SAUNDERS DANIEL &<br>ANDERSON, LLP<br>Hightower Building<br>105 N. Hudson Ave., Suite 1000<br>Oklahoma City, OK  73102 |
| D. Michael McBride III<br>Susan E. Huntsman<br>CROWE & DUNLEVY, PC<br>500 Kennedy Building<br>321 S. Boston Ave.<br>Tulsa, OK  74103 | |

Ryan A. Ray

# EXHIBIT 11

IN THE DISTRICT COURT OF OSAGE COUNTY
STATE OF OKLAHOMA

District Court Osage County, Okla.
FILED

5  AUG 1 9 2019

Jennifer Beid  Court Clerk
by _____  Deputy

THE OSAGE NATION,                          )
                                           )
          Plaintiff,                       )
                                           )
vs.                                        )   Case No. CJ-2019-135
                                           )   Judge Stuart Tate
(1)  PURDUE PHARMA L.P.,                    )
(2)  PURDUE PHARMA INC.,                    )
(3)  THE PURDUE FREDERICK COMPANY,          )
(4)  CEPHALON, INC.,                        )
(5)  TEVA PHARMACEUTICAL INDUSTRIES,        )
     LTD.,                                  )
(6)  TEVA PHARMACEUTICALS US, INC.,         )
(7)  JANSSEN PHARMACEUTICALS, INC.,         )
(8)  JOHNSON & JOHNSON,                     )
(9)  ORTHO-MCNEIL-JANSSEN                   )
     PHARMACEUTICALS, INC.,                 )
(10) JANSSEN PHARMACEUTICA, INC.,           )
(11) ENDO HEALTH SOLUTIONS INC.,            )
(12) ENDO PHARMACEUTICALS INC.,             )
(13) PAR PHARMACEUTICALS, INC.,             )
(14) ALLERGAN PLC,                          )
(15) ACTAVIS PLC,                           )
(16) WATSON PHARMACEUTICAL, INC.            )
(17) WATSON LABORATORIES, INC.,             )
(18) ACTAVIS PHARMA, INC.,                  )
(19) WATSON PHARMA, INC.,                   )
(20) ACTAVIS LLC,                           )
(21) MALLINCKRODT PLC,                      )
(22) MALLINCKRODT LLC,                      )
(23) SPECGX, LLC,                           )
(24) MYLAN PHARMACEUTICALS INC.,            )
(25) SANDOZ, INC.,                          )
(26) MCKESSON CORP.,                        )
(27) CARDINAL HEALTH, INC.,                 )
(28) AMERISOURCEBERGEN CORP.,               )
(29) WALGREENS BOOTS ALLIANCE, INC.         )
     a/k/a WALGREEN CO.,                    )
(30) MORRIS & DICKSON CO, LLC,              )
(31) WAL-MART INC. f/k/a/ WAL-MART          )
     STORES INC.,                           )
(32) MCQUEARY BROTHERS DRUG                 )
     COMPANY, LLC, and                      )
(33) SAJ DISTRIBUTORS,                      )

1

Defendants.                                    )

## ENTRY OF APPEARANCE

In accordance with 12 Okla. Stat. § 2005.2, without waiving any 12 Okla. Stat. § 2012

defenses, Stuart D. Campbell and Kaylee Davis-Maddy of the firm Doerner, Saunders, Daniel &

Anderson hereby enter their appearance as counsel for the Defendant, McKesson Corporation,

and request that all filings and correspondence be mailed to their attention at the addresses

below.

> **DOERNER, SAUNDERS, DANIEL &**
> **ANDERSON, L.L.P.**
>
> By: _____
> Stuart D. Campbell, OBA #11246
> 700 Williams Center Tower II
> Two West Second Street
> Tulsa, Oklahoma 74103-3522
> Telephone:  (918) 591-5242
> Facsimile:  (918) 925-5242
> E-mail:  scampbell@dsda.com
>
> And
>
> Kaylee Davis-Maddy, OBA #31534
> Hightower Building
> 105 N. Hudson Ave, Suite 1000
> Oklahoma City, OK 73102
> Telephone:  405-319-3513
> E-mail:  kmaddy@dsda.com
>
> *COUNSEL FOR DEFENDANT, MCKESSON CORPORATION*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August ___ 2019, a true and correct copy of the above and foregoing document was:

☒ mailed with postage prepaid thereon;
☐ mailed by certified mail, Return Receipt;
☐ transmitted via e-mail;
☐ transmitted via facsimile; or
☐ hand-delivered;

to:   M. David Riggs
Lisa R. Riggs
Riggs, Abney, Neal, Turpen
   Orbison & Lewis
502 West Sixth Street
Tulsa, OK  74119

Curtis "Muskrat" Bruehl
Matthew J. Sill
Harrison C. Lujan
Fulmer Sill Law Group
P.O. Box 2448
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK  73103

Stuart D. Campbell

5086303.1

3

# EXHIBIT 12

IN THE DISTRICT COURT OF OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )      Case No.  CJ-2019-135
                                     )
PURDUE PHARMA L.P., et al.,          )
                                     )
            Defendants.              )
                                     )
                                     )

**MANUFACTURER DEFENDANTS' MOTION FOR ENLARGEMENT
OF TIME IN WHICH TO ANSWER, MOVE, OR OTHERWISE
RESPOND TO THE OSAGE NATION'S PETITION**

Defendants Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; and Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc. ("Janssen Defendants") move for a 45-day enlargement of time to answer, move, or otherwise respond to Plaintiff The Osage Nation's ("Plaintiff") Petition pursuant to OKLA. STAT. TIT. 12, § 2006(B).  Without entering an appearance or conceding service on behalf of any other party, Janssen Defendants request that the enlargement of time also be applicable to its co-defendant pharmaceutical manufacturers, including: Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceutical, Inc.; Mallinckrodt plc; Mallinckrodt LLC; Specgx, LLC; Mylan Pharmaceuticals Inc.; and Sandoz Inc. (incorrectly named in the Petition as "Sandoz, Inc.") (collectively, including Janssen Defendants, the "Manufacturer Defendants").  In support of this Motion, Janssen Defendants state as follows:

1. On or about August 5, 2019, Defendants Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; and Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc. were served with Plaintiff's Petition.

2. Plaintiff's Petition is 70 pages in length containing 225 separate paragraphs requiring responses.

3. This Motion for Enlargement of Time is made without waiving any rights or defenses Defendants may have under Okla. Stat. tit. 12, § 2012, and subject to *Young v. Walton*, 1991 OK 20, 807 P.2d 248.

4. This Motion is made in good faith and not made in order to delay these proceedings or to prejudice the Plaintiff.

5. Plaintiff's counsel has been contacted regarding this extension but has yet to respond. *See* Exhibit A attached hereto.

6. A proposed Order granting additional time to file responsive pleadings is hereby attached as Exhibit B.

WHEREFORE, Defendants respectfully request this Court grant Defendants' Motion for Enlargement of Time.

Respectfully submitted,

John H. Sparks, OBA No. 15661
Michael W. Ridgeway, OBA No. 15657
ODOM, SPARKS & JONES, PLLC
Suite 140
HiPoint Office Building
2500 McGee Drive
Norman, OK 73072
(405) 701-1863
(405) 310-5394 Facsimile
sparksj@odomsparks.com
ridgewaym@odomsparks.com

**ATTORNEYS FOR DEFENDANTS
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a JANSSEN
PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.**

Page 3 of 4

## CERTIFICATE OF SERVICE

Pursuant to Okla. Stat. tit. 12, § 2005(D), this is to certify on August 22, 2019, a true and correct copy of the above and foregoing has been served via the United States Postal Service, First Class postage prepaid, to the following:

Curtis Bruehl
Matthew J. Sill
Harrison C. Lujan
Fulmer Sill Law Group
P. O. Box 2448
1101 North Broadway Avenue, Suite 102
Oklahoma City, OK 73103
msill@fulmersill.com
hlujan@fulmersill.com
*Attorneys for Plaintiff*

Stuart D. Campbell
Doerner, Saunders, Daniel & Anderson
700 Williams Center Tower II
Two West Second Street
Tulsa, OK 74103-3522
scampbell@dsda.com
*Attorneys for Defendant McKesson Corporation*

Kaylee Davis-Maddy
Hightower Building
105 North Hudson Avenue, Suite 1000
Oklahoma City, OK 73102
kmaddygdsda.com
*Attorney for Defendant McKesson Corporation*

Ryan Ray
Norman Wohlgemuth Chandler Jeter Barnett & Ray, P.C.
2900 Mid-Continent Tower
401 South Boston Avenue
Tulsa, OK 74103
rar@nwcjlaw.com
*Attorney for Defendants Cardinal Health, Inc. and The Harvard Drug Group, LLC*

D. Michael McBride
Susan E. Huntsman
Crowe & Dunlevy
500 Kennedy Building
321 South Boston Avenue
Tulsa, OK 74103-3313
mike.mcbride@crowedunlevy.com
susan.huntsman@crowedunlevy.com
*Attorneys for Defendant AmerisourceBergen Drug Corporation*

John H. Sparks

Page 4 of 4

## John Sparks

| | |
|---|---|
| **From:** | John Sparks |
| **Sent:** | Wednesday, August 21, 2019 3:44 PM |
| **To:** | Matt Sill; cbruehl@fulmersill.com; Harrison Lujan; 'Joshua Burns' |
| **Cc:** | Michael Ridgeway; Alyssa Kirkham; 'Kim Jones (jonesk@odomsparks.com)' |
| **Subject:** | Osage v Purdue: CJ-2019-135 |

Mr. Sill:

Similar to the request below, may we have your agreement for a 45-day enlargement of time for the Manufacturer Defendants to file responsive pleadings in the Osage Nation case (CJ-2019-135), which is filed in Osage County?

It is our understanding the current due date for responsive pleadings to be filed on behalf of Janssen and J&J is August 26, 2019. We understand the due date for Purdue is August 22, 2019.

We propose October 10, 2019, as the new due date (if approved) for responsive pleadings to be filed on behalf of all defendant manufacturers which join this motion.

It is our understanding Josh Burns (Crowe & Dunlevy), counsel for Purdue, called your office earlier today and left a voice message with substantially the same request.

Mr. Burns is copied on this email.

If you are agreeable (or not), please let us know so we may inform the Court accordingly.

As always, we appreciate your time, attention and accommodation in these matters.

If you have any questions or suggestions, please feel free to contact us at your convenience.

Sincerely,

JOHN SPARKS
ODOM, SPARKS & JONES, PLLC
SUITE 140
HIPOINT OFFICE BUILDING
2500 MCGEE DRIVE
NORMAN, OK 73072
405-701-1863 (W)
405-919-8000 (M)
sparksj@odomsparks.com
www.ODOMSPARKS.com

CAUTION: THIS ELECTRONIC MESSAGE (INCLUDING ALL ATTACHMENTS) IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH IT IS ADDRESSED, IS COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, MAY CONTAIN ITEMS AND INFORMATION WHICH MAY BE CONFIDENTIAL AND/OR SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE AND/OR THE WORK PRODUCT PRIVILEGE. ANY REVIEW, RETRANSMISSION, DISSEMINATION OR OTHER USE OF, OR TAKING OF ANY ACTION IN RELIANCE UPON, THE INFORMATION IN THIS MESSAGE BY PERSONS OR ENTITIES OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED AND MAY BE UNLAWFUL. IF YOU RECEIVED MESSAGE THIS IS ERROR, PLEASE CONTACT THE SENDER AND DELETE THE MATERIAL FROM ANY COMPUTER AND/OR OTHER ELECTRONIC DEVICE. IN ACCORDANCE WITH IRS CIRCULAR 230, WE ARE REQUIRED TO INFORM YOU THE ADVICE CONTAINED HEREIN (INCLUDING ALL ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED FOR THE PURPOSE OF AVOIDING ANY PENALTIES WHICH MAY BE IMPOSED UNDER FEDERAL, STATE OR LOCAL TAX LAW AND CANNOT BE USED BY YOU OR ANY OTHER TAXPAYER FOR THE PURPOSE OF AVOIDING SUCH PENALTIES.

**From:** Court, Todd <Todd.Court@mcafeetaft.com>
**Sent:** Tuesday, August 20, 2019 6:32 PM
**To:** Michael Ridgeway <ridgewaym@odomsparks.com>; Harrison Lujan <hlujan@fulmersill.com>; Puckett, Tony G. <Tony.Puckett@mcafeetaft.com>; Matt Sill <msill@fulmersill.com>; monty@delluomo.com

**Exhibit A**

Cc: John Sparks <sparksj@odomsparks.com>
Subject: RE: City of Anadarko vs. Purdue Pharma

Michael, we don't object.  We are out of town so can't sign.

From: Michael Ridgeway [mailto:ridgewaym@odomsparks.com]
Sent: Tuesday, August 20, 2019 4:02 PM
To: Harrison Lujan; Court, Todd; Puckett, Tony G.; Matt Sill; monty@delluomo.com
Cc: John Sparks
Subject: RE: City of Anadarko vs. Purdue Pharma

Gentlemen,

I have not yet heard back regarding our request for a 45-day enlargement of time to respond.  Attached is a proposed order that contains some edits from what I sent previously.  If you agree, please sign and return.

Thanks,

MICHAEL W. RIDGEWAY
ODOM, SPARKS & JONES, PLLC
SUITE 140
HIPOINT OFFICE BUILDING
2500 MCGEE DRIVE
NORMAN, OK  73072

405-701-1863
405-310-5394  FACSIMILE
ridgewaym@odomsparks.com

CAUTION:  THIS MESSAGE IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN ITEMS AND INFORMATION WHICH MAY BE CONFIDENTIAL AND/OR SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE AND/OR THE WORK PRODUCT PRIVILEGE.  ANY REVIEW, RETRANSMISSION, DISSEMINATION OR OTHER USE OF, OR TAKING OF ANY ACTION IN RELIANCE UPON, THE INFORMATION IN THIS E-MAIL BY PERSONS OR ENTITIES OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED AND MAY BE UNLAWFUL.  IF YOU RECEIVED THIS IN ERROR, PLEASE CONTACT THE SENDER AND DELETE THE MATERIAL FROM ANY COMPUTER.  IN ACCORDANCE WITH IRS CIRCULAR 230, WE ARE REQUIRED TO INFORM YOU THE ADVICE CONTAINED HEREIN (INCLUDING ALL ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED FOR THE PURPOSE OF AVOIDING ANY PENALTIES WHICH MAY BE IMPOSED UNDER FEDERAL, STATE OR LOCAL TAX LAW AND CANNOT BE USED BY YOU OR ANY OTHER TAXPAYER FOR THE PURPOSE OF AVOIDING SUCH PENALTIES.

From: Michael Ridgeway
Sent: Monday, August 19, 2019 9:29 AM
To: Harrison Lujan <hlujan@fulmersill.com>
Cc: todd.court@mcafeetaft.com; tony.puckett@mcafeetaft.com; Matt Sill <msill@fulmersill.com>; 'monty@delluomo.com' <monty@delluomo.com>; John Sparks <sparksj@odomsparks.com>
Subject: RE: City of Anadarko vs. Purdue Pharma

Harrison,

Attached is an Order granting a 45-day enlargement of time for Manufacturer Defendants to respond.  If this meets with your approval, please sign, scan and return so I can get it filed in Caddo County tomorrow.   Let me know if you have questions or comments

Thanks,

2

**Exhibit A**

Michael W. Ridgeway
Odom, Sparks & Jones, PLLC
Suite 140
HiPoint Office Building
2500 McGee Drive
Norman, OK  73072

405-701-1863
405-310-5394  Facsimile
ridgewaym@odomsparks.com

CAUTION: This message is intended only for the person or entity to which it is addressed and may contain items and information which may be confidential and/or subject to the attorney-client privilege and/or the work product privilege. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, the information in this e-mail by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this in error, please contact the sender and delete the material from any computer. In accordance with IRS Circular 230, we are required to inform you the advice contained herein (including all attachments) is not intended or written to be used for the purpose of avoiding any penalties which may be imposed under Federal, State or Local tax law and cannot be used by you or any other taxpayer for the purpose of avoiding such penalties.

**From:** Michael Ridgeway
**Sent:** Friday, August 16, 2019 3:59 PM
**To:** Harrison Lujan <hlujan@fulmersill.com>
**Cc:** todd.court@mcafeetaft.com; tony.puckett@mcafeetaft.com; Matt Sill <msill@fulmersill.com>; monty@delluomo.com
**Subject:** City of Anadarko vs. Purdue Pharma

Harrison,

Consistent with what we have done previously, may we have your agreement for a 45-day enlargement of time for the Manufacturer Defendants to file a responsive pleading in the City of Anadarko case filed in Caddo County?  I will email an order for your approval either today or Monday.

Thanks,

Michael W. Ridgeway
Odom, Sparks & Jones, PLLC
Suite 140
HiPoint Office Building
2500 McGee Drive
Norman, OK  73072

405-701-1863
405-310-5394  Facsimile
ridgewaym@odomsparks.com

CAUTION: This message is intended only for the person or entity to which it is addressed and may contain items and information which may be confidential and/or subject to the attorney-client privilege and/or the work product privilege. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, the information in this e-mail by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this in error, please contact the sender and delete the material from any computer. In accordance with IRS Circular 230, we are required to inform you the advice contained herein (including all attachments) is not intended or written to be used for the purpose of avoiding any penalties which may be imposed under Federal, State or Local tax law and cannot be used by you or any other taxpayer for the purpose of avoiding such penalties.

**Exhibit A**

IN THE DISTRICT COURT OF OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                          )
                                           )
          Plaintiff,                       )
                                           )
v.                                         )          Case No.  CJ-2019-135
                                           )
PURDUE PHARMA L.P., et al.,                )
                                           )
          Defendants.                      )
                                           )
                                           )
                                           )

## ORDER GRANTING MANUFACTURER DEFENDANTS' MOTION FOR ENLARGEMENT OF TIME TO ANSWER, MOVE, OR OTHERWISE RESPOND

Defendants Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; and Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.'s (the "Janssen Defendants") Motion for Enlargement of Time to Answer, Move, or Otherwise Respond to Plaintiff's Petition comes before this Court. For good cause shown, and pursuant to OKLA. STAT. TIT. 12, § 2006(B), the Court finds that Defendants' Motion should be granted for the benefit of the Janssen Defendants and their co-defendants Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceutical, Inc.; Mallinckrodt plc; Mallinckrodt LLC; Specgx, LLC; Mylan Pharmaceuticals Inc.; and Sandoz Inc. (incorrectly named in the Petition as "Sandoz, Inc.") (collectively, including Janssen Defendants, the "Manufacturer Defendants").

IT IS THEREFORE ORDERED that each of the Manufacturer Defendants is granted a 45-day enlargement of time to respond to Plaintiff's Petition.

DATED this _____ day of August, 2019.

_____
JUDGE OF THE DISTRICT COURT

**Exhibit B**

Submitted by:

_John H. Sparks_

John H. Sparks, OBA No. 15661
Michael W. Ridgeway, OBA No. 15657
ODOM, SPARKS & JONES, PLLC
Suite 140
HiPoint Office Building
2500 McGee Drive
Norman, OK 73072
(405) 701-1863
(405) 310-5394 Facsimile
sparksj@odomsparks.com
ridgewaym@odomsparks.com

**ATTORNEYS FOR DEFENDANTS
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICAL, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA, INC.
n/k/a
JANSSEN PHARMACEUTICALS, INC.**

**Exhibit B**

# EXHIBIT 13

IN THE DISTRICT COURT OF OSAGE COUNTY
STATE OF OKLAHOMA

THE OSAGE NATION,                          )
                                           )
            Plaintiff,                     )
                                           )
v.                                         )      Case No.  CJ-2019-135
                                           )
PURDUE PHARMA L.P., et al.,                )
                                           )
            Defendants.                    )
                                           )
                                           )

## ORDER GRANTING MANUFACTURER DEFENDANTS' MOTION FOR ENLARGEMENT OF TIME TO ANSWER, MOVE, OR OTHERWISE RESPOND

Defendants Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; and Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.'s (the "Janssen Defendants") Motion for Enlargement of Time to Answer, Move, or Otherwise Respond to Plaintiff's Petition comes before this Court. For good cause shown, and pursuant to OKLA. STAT. TIT. 12, § 2006(B), the Court finds that Defendants' Motion should be granted for the benefit of the Janssen Defendants and their co-defendants Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceutical, Inc.; Mallinckrodt plc; Mallinckrodt LLC; Specgx, LLC; Mylan Pharmaceuticals Inc.; and Sandoz Inc. (incorrectly named in the Petition as "Sandoz, Inc.") (collectively, including Janssen Defendants, the "Manufacturer Defendants").

IT IS THEREFORE ORDERED that each of the Manufacturer Defendants is granted a 45-day enlargement of time to respond to Plaintiff's Petition.

DATED this 23ʳᵈ day of August, 2019.

_____
JUDGE OF THE DISTRICT COURT

Submitted by:

John H. Sparks, OBA No. 15661
Michael W. Ridgeway, OBA No. 15657
ODOM, SPARKS & JONES, PLLC
Suite 140
HiPoint Office Building
2500 McGee Drive
Norman, OK 73072
(405) 701-1863
(405) 310-5394 Facsimile
sparksj@odomsparks.com
ridgewaym@odomsparks.com

**ATTORNEYS FOR DEFENDANTS
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a
JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA, INC.
n/k/a
JANSSEN PHARMACEUTICALS, INC.**